[Cite as *State v. Bush*, 2023-Ohio-4473.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## LOGAN COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

JOSIA BUSH,

    DEFENDANT-APPELLANT.

CASE NO. 8-22-37

O P I N I O N

Appeal from Logan County Common Pleas Court
Trial Court No. CR 21 06 0169

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision:  December 11, 2023

APPEARANCES:

    *Alison Boggs* **for Appellant**

    *Eric C. Stewart* **for Appellee**

**WALDICK, J.**

**{¶1}** Defendant-appellant, Josia Bush ("Bush"), appeals the November 10, 2022 judgment of conviction and sentence entered against him in the Logan County Court of Common Pleas, following a jury trial in which Bush was found guilty of Complicity to Aggravated Burglary, Complicity to Aggravated Robbery, Complicity to Kidnapping, Complicity to Felonious Assault, and two counts of Complicity to Murder, all with firearm specifications. On appeal, Bush raises twelve assignments of error. For the reasons set forth below, we affirm in part and reverse in part.

*Factual and Procedural Background*

**{¶2}** This case stems from a November 27, 2019 home invasion of a residence in Bellefontaine, Ohio. The evidence presented at trial, which is detailed extensively in the fourth assignment of error, *infra*, reflects that at approximately 11:30 on the night before Thanksgiving, three masked males, one of whom was armed with a loaded firearm, entered the house at 601 West Columbus Avenue. In the minutes that followed, one of the female residents was threatened at gunpoint and two other female residents were pistol-whipped, while the perpetrators sought to steal money or drugs. The home invasion was interrupted, with tragic results, when three of the other residents arrived home. A gunfight ensued, which resulted in two persons being killed by the perpetrators.

{¶3} On December 2, 2019, a complaint was filed in the Juvenile Division of the Logan County Common Pleas Court, alleging that Bush was delinquent by way of committing Aggravated Robbery and Murder with a firearm specification, either as a principal offender or by complicity. On December 5, 2019, an amended delinquency complaint was filed, charging Bush with Complicity to Aggravated Burglary, Complicity to Aggravated Robbery, Complicity to Kidnapping, two counts of Complicity to Felonious Assault, and two counts of Complicity to Murder. A firearm specification was also alleged as to all seven charges.

{¶4} On December 5, 2019, the state also filed a motion alleging that Bush was subject to a mandatory transfer of jurisdiction pursuant to Juv.R. 30(B) and R.C. 2152.10(A)(1)(a) and 2152.12(A)(1)(a)(i), and requesting that the juvenile court transfer jurisdiction to the common pleas court's general division so that Bush could be prosecuted as an adult.

{¶5} On December 30, 2019, the state filed an amended motion requesting that the juvenile court relinquish jurisdiction, in which the state asserted that Bush was subject to a discretionary transfer of jurisdiction pursuant to Juv.R. 30(C) and R.C. 2152.10(B) and 2152.12(B)(1)-(3).

{¶6} On July 15 and 16, 2020, the juvenile court held a preliminary hearing. By judgment entry filed on October 26, 2020, the juvenile court ruled that there was probable cause to believe that Bush committed each of the offenses charged in the

amended delinquency complaint, as well as probable cause to support the firearm specifications as to all counts.

{¶7} On March 23, 2021, an amenability hearing was held. On June 29, 2021, the juvenile court filed a judgment entry granting the state's motion to transfer jurisdiction to the Logan County Court of Common Pleas, General Division, and ordering that Bush be bound over to that court to be tried as an adult.

{¶8} On July 13, 2021, the Logan County Grand Jury returned a seven-count indictment against Bush, charging him as follows: Count 1 – Complicity to Aggravated Burglary, a first-degree felony in violation of R.C. 2911.11(A)(1) and R.C. 2923.03; Count 2 – Complicity to Aggravated Robbery, a first-degree felony in violation of R.C. 2911.01(A)(3) and R.C. 2923.03; Count 3 – Complicity to Kidnapping, a first-degree felony in violation of R.C. 2905.01(A)(2) and R.C. 2923.03; Count 4 – Complicity to Felonious Assault, a second-degree felony in violation of R.C. 2903.11(A)(2) and R.C. 2923.03; Count 5 – Complicity to Felonious Assault, a second-degree felony in violation of R.C. 2903.11(A)(2) and R.C. 2923.03; Count 6 – Complicity to Murder, an unclassified felony in violation of R.C. 2903.02(B) and R.C. 2923.03; and Count 7 – Complicity to Murder, an unclassified felony in violation of R.C. 2903.02(B) and R.C. 2923.03. All seven counts of the indictment also contained a three-year firearm specification pursuant to R.C. 2941.145(A).

{¶9} On July 16, 2021, an arraignment was held and Bush entered a plea of not guilty to all counts and specifications in the indictment.

{¶10} On November 10, 2021, a change of plea hearing was held. At that time, Bush entered a negotiated plea of guilty to Count 1 of the indictment as originally charged and to Count 2 without the firearm specification. Pursuant to the terms of the negotiated plea, Bush agreed to testify truthfully against his co-defendants, and the parties agreed to make a joint sentencing recommendation of 20 to 25 years in prison, with Bush's sentencing hearing to be deferred until the cases pending against his co-defendants were resolved. Finally, the prosecution agreed to dismiss the remaining five counts of the indictment and the firearm specification on Count 2, but the agreed-upon dismissals were to be held in abeyance until the sentencing hearing took place.

{¶11} On June 17, 2022, Bush filed a motion to withdraw his guilty plea pursuant to Crim.R. 32.1. On July 14, 2022, the state filed a response in opposition to Bush's motion. On that same date, a hearing was held on the plea withdrawal motion. On July 18, 2022, the trial court filed a judgment entry denying Bush's motion to withdraw his plea.

{¶12} On August 2, 2022, the prosecution filed a motion to revoke the plea agreement, seeking to vacate the guilty plea and have the matter set for trial. By judgment entry filed that same date, the trial court granted the state's motion.

{¶13} On August 15, 2022, Bush filed a motion to suppress any and all statements made by him to law enforcement. On September 2, 2022, a suppression hearing was held. On September 26, 2022, the trial court filed a judgment entry denying Bush's motion to suppress.

{¶14} On October 5, 2022, Bush filed a motion seeking a change of venue. On that same date, the trial court filed a judgment entry denying the motion for change of venue.

{¶15} On October 25, 2022, a jury trial commenced in the case. During the course of the three-day trial, the prosecution presented the testimony of twenty witnesses and introduced numerous exhibits. The defense then presented testimony from three witnesses.

{¶16} On October 28, 2022, the jury returned verdicts on all counts. Bush was found not guilty on Count 4, but guilty on all other counts and specifications. The trial court accepted the verdicts, discharged the jury, and ordered a presentence report.

{¶17} On November 10, 2022, a sentencing hearing was held. As a preliminary matter, it was determined that the kidnapping conviction would merge with the aggravated robbery conviction, and the prosecution elected to proceed to sentencing on the aggravated robbery. Bush was then sentenced to an aggregate prison term of 75 years to life, as follows: Count 1 – a minimum term of 11 years up to a potential maximum term of 16.5 years, plus a 3-year term for the firearm

specification; Count 2 – 11 years, plus a 3-year term for the firearm specification; Count 5 – 8 years, plus a 3-year term for the firearm specification; Count 6 – 15 years to life, plus a 3-year term for the firearm specification; and Count 7 – 15 years to life, plus a 3-year term for the firearm specification, with all sentences to be served consecutively.

{¶18} On November 15, 2022, Bush filed the instant appeal, in which twelve assignments of error have been raised for our review.

### First Assignment of Error

**The juvenile court abused its discretion and violated Josia Bush's due process rights when it determined Josia was not amenable to treatment in the juvenile system, in villation [*sic*] of R.C. 2151.12(B), the Fifth, Eight [*sic*] and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.**

### Second Assignment of Error

**The trial court erred when it granted the state's motion to revoke plea agreement before there was any breach of the agreement.**

### Third Assignment of Error

**The trial court erred when it overruled Mr. Bush's suppression motion in violation of the Fifth Amendment to the United States Constitution.**

### Fourth Assignment of Error

**Appellant's right to confrontation was violated when the trial court allowed various witnesses to testify to anything Austin Allen told them in violation of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.**

**Fifth Assignment of Error**

**The jury's verdict is both against the manifest weight and sufficiency of the evidence, resulting in verdicts that are inconsistent.**

**Sixth Assignment of Error**

**Mr. Bush was unduly prejudiced by the jury instructions, wherein the instructions identified Elijah Barret [sic] and Ethan Grim as co-defendants, but failed to identify Austin Allen as a co-defendant, which resulted in the continued failure to instruct the jury that anything attributed to Mr. Allen during the trial should have had the same co-defendant instruction as was given in regard to Elijah Barret's [sic] testimony.**

**Seventh Assignment of Error**

**Trial court erred when it overruled appellant's motion for change of venue.**

**Eighth Assignment of Error**

**Appellant was prejudiced because he did not have a jury of his peers.**

**Ninth Assignment of Error**

**Appellant did not receive effective assistance of counsel depriving him of a fair trial due to the cumulative errors of trial counsel throughout the trial in violation of the Sixth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.**

**Tenth Assignment of Error**

**Appellant's sentence is contrary to law.**

**Eleventh Assignment of Error**

**This Court erred in overruling Mr. Bush's motion to supplement the record with the sentencing entries of his co-defendants, compromising his ability to argue disparity in sentencing.**

**Twelfth Assignment of Error**

**Reagon [*sic*] Tokes Issue.**

*First Assignment of Error*

{¶19} In the first assignment of error, Bush asserts that the juvenile court abused its discretion in transferring Bush's case to the general division so that Bush would be prosecuted as an adult. Bush argues that the juvenile court misapplied certain statutory factors in reaching that decision, and that the court did not give adequate weight to the evaluation done by a mental health professional who concluded Bush was amenable to rehabilitation in the juvenile justice system.

{¶20} R.C. 2152.12 governs the transfer of a child from the juvenile court to the general division of the common pleas court. Pursuant to R.C. 2152.12(B), a juvenile court has the discretion to transfer a case for criminal prosecution if the court finds that three conditions are met: (1) the child was 14 or older at the time of the act charged; (2) there is probable cause to believe that the child committed the act charged; and (3) the child is "not amenable to care or rehabilitation within the juvenile system, and the safety of the community may require that the child be subject to adult sanctions."

{¶21} In making the amenability determination under subdivision (B)(3) of R.C. 2152.12, the statute requires the juvenile court to decide whether the factors in R.C. 2152.12(D) that favor transferring jurisdiction outweigh the factors in R.C. 2152.12(E) that favor retaining jurisdiction.

{¶22} The version of R.C. 2152.12(D) applicable to this case set forth the factors favoring a transfer of jurisdiction as follows:

> (D) In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant factors, and any other relevant factors, in favor of a transfer under that division:
>
> (1) The victim of the act charged suffered physical or psychological harm, or serious economic harm, as a result of the alleged act.
>
> (2) The physical or psychological harm suffered by the victim due to the alleged act of the child was exacerbated because of the physical or psychological vulnerability or the age of the victim.
>
> (3) The child's relationship with the victim facilitated the act charged.
>
> (4) The child allegedly committed the act charged for hire or as a part of a gang or other organized criminal activity.
>
> (5) The child had a firearm on or about the child's person or under the child's control at the time of the act charged, the act charged is not a violation of section 2923.12 of the Revised Code, and the child, during the commission of the act charged, allegedly used or displayed the firearm, brandished the firearm, or indicated that the child possessed a firearm.
>
> (6) At the time of the act charged, the child was awaiting adjudication or disposition as a delinquent child, was under a community control sanction, or was on parole for a prior delinquent child adjudication or conviction.

(7) The results of any previous juvenile sanctions and programs indicate that rehabilitation of the child will not occur in the juvenile system.

(8) The child is emotionally, physically, or psychologically mature enough for the transfer.

(9) There is not sufficient time to rehabilitate the child within the juvenile system.

The version of R.C. 2152.12(E) applicable to this case set forth the factors weighing against a transfer of jurisdiction as follows:

(E) In considering whether to transfer a child under division (B) of this section, the juvenile court shall consider the following relevant factors, and any other relevant factors, against a transfer under that division:

(1) The victim induced or facilitated the act charged.

(2) The child acted under provocation in allegedly committing the act charged.

(3) The child was not the principal actor in the act charged, or, at the time of the act charged, the child was under the negative influence or coercion of another person.

(4) The child did not cause physical harm to any person or property, or have reasonable cause to believe that harm of that nature would occur, in allegedly committing the act charged.

(5) The child previously has not been adjudicated a delinquent child.

(6) The child is not emotionally, physically, or psychologically mature enough for the transfer.

(7) The child has a mental illness or intellectual disability.

(8) There is sufficient time to rehabilitate the child within the juvenile system and the level of security available in the juvenile system provides a reasonable assurance of public safety.

**{¶23}** Pursuant to the governing statute, the juvenile court is also required to "order an investigation into the child's social history, education, family situation, and any other factor bearing on whether the child is amenable to juvenile rehabilitation, including a mental examination of the child * * *." R.C. 2152.12(C).

**{¶24}** Finally, as this Court explained in *State v. Everhardt*, 3d Dist. Hancock No. 5-17-25, 2018-Ohio-1252, at ¶ 19:

> The Supreme Court of Ohio has consistently applied the abuse-of-discretion standard in the review of discretionary-transfer proceedings from juvenile court to the general division of common pleas court. *In re M.P.*, 124 Ohio St.3d 445, 2010-Ohio-599, ¶ 14, 923 N.E.2d 584; *State v. Watson*, 47 Ohio St.3d 93, 95, 547 N.E.2d 1181 (1989). "[A]n amenability hearing is a broad assessment of individual circumstances and is inherently individualized and fact-based. Thus a juvenile court's determination regarding a child's amenability to rehabilitation in the juvenile system is reviewed by an appellate court under an abuse of discretion standard." *In re M.P.*, at ¶ 14. An abuse of discretion is a decision that was arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "A review under the abuse-of-discretion standard is a deferential review." *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14, 972 N.E.2d 528. "As long as the [juvenile] court considers the appropriate statutory factors and there is some rational basis in the record to support the court's findings when applying those factors, we cannot conclude that the [juvenile] court abused its discretion in deciding whether to transfer jurisdiction." *State v. Phillips*, 12th Dist. Clinton No. CA2009-03-001, 2010-Ohio-2711, ¶ 39.

**{¶25}** In this case, at the amenability hearing held on March 23, 2021, the parties first stipulated to the admission of a written report regarding the court-

ordered investigation and mental evaluation of Bush done by Barbra A. Bergman, Ph.D., of the Forensic Psychiatry Center for Western Ohio. Bergman did not testify at the hearing.

{¶26} In her report, Bergman found that Bush was well-oriented and aware of his situation, with no sign of delusional thoughts or unusual preoccupations, and with sustained concentration and focused attention throughout her lengthy interview with him. The report noted that school records, including the results of psychological testing, confirmed intellectual functioning in the average range, but that Bush's judgment appeared to be impaired by virtue of chronic acting-out behavior, poor impulse control, and chronic substance abuse. The report detailed the results of Bergman's investigation and inquiry into Bush's family background and relationships, peer relationships, educational history, criminal history, mental health history, substance abuse history, and developmental maturity.

{¶27} The report then calculated Bush's scores in various categories on the Risk Sophistication Treatment Inventory ("RSTI") Rating Scale, and concluded that Bush's scores on the RSTI scale indicated that his amenability to treatment in the juvenile court system is in the middle range as compared to that of other juvenile offenders. The report mentioned several factors in Bush's case that indicated a moderately good prognosis for amenability to treatment. Finally, the report concluded with Bergman's opinions that Bush's risk of future violence was low and that he was amenable to rehabilitation within the juvenile justice system.

{¶28} At the amenability hearing, the prosecution then called one witness, Amy Johnson, a licensed social worker employed as a probation officer with the Champaign County Family Court. Johnson testified that she had previously served as Bush's probation officer, after Bush had his first contact with juvenile court in 2014 at age eleven, for making false alarms.

{¶29} As a result of that initial offense, Bush was offered an option to undertake an "intake program" for first-time offenders that involved avoiding a delinquency adjudication by completing community service, writing an apology letter, and writing a fire safety paper. Bush did not successfully complete the intake program, and so was ordered into counseling by the court and also was required to take medication for his mental health issues. Bush had contact with the juvenile court again in 2015 (disorderly conduct) and 2016 (domestic violence).

{¶30} In 2017, Bush was adjudicated delinquent for two more crimes, and was placed on level two probation, which was slightly more structured. During Bush's time on level two probation, he had two probation violations and additional charges. As a result, Bush was ordered by the juvenile court to do more community service and was ordered to have no contact with Elijah Barrett and Ethan Grim, who were Bush's co-defendants in this case. Bush also served some time in detention. In 2018, Bush faced a drug charge and received a suspended sentence.

{¶31} In 2019, Bush received an unruly charge, for leaving his home and refusing to go to school. At that time, the juvenile court again placed Bush on

probation. Johnson testified that, throughout Bush's years of involvement with juvenile court, he had been both encouraged and at times ordered to go to counseling, including substance abuse counseling, and also anger management, trauma, and ADHD-type counseling. There was also counseling offered to his family, which occurred.

{¶32} After Bush was placed on probation in July of 2019, he violated his probation the very same day and a multiple-count probation violation action was filed. Bush was placed in detention initially, and then released on an ankle monitor. Approximately a week after his release, he violated the ankle monitor restrictions and was then ordered into a custodial 90-day therapeutic intervention program known as "CRC." While in custody in that program, Bush was involved in two incidents that resulted in his release date being extended.

{¶33} Ultimately, Bush was released from the CRC detention program on November 27, 2019, which was the date of the offenses at issue in this case. At the time of that release, Bush was still on probation with the Champaign County Juvenile Court. A term of that probation was that Bush not associate with anyone else on probation, parole, or involved with the court. At that time, both Ethan Grim and Elijah Barrett were also on probation with the Champaign County Juvenile Court. On November 27, 2019, Bush was released from detention sometime in the early afternoon hours, and his grandmother picked him up.

**{¶34}** Finally, Johnson testified on direct examination that Bush's family life was also a struggle, as he apparently did not know his father, his mother had been in and out of prison for her drug issues, there was domestic violence in the home, his older brother had criminal involvement, and his sister had her own trauma issues.

**{¶35}** On cross-examination, Johnson testified that Bush seemed to be a follower, as opposed to a leader; that he is easily manipulated; and that Bush was always respectful and nonaggressive in her dealings with him. Johnson testified that Bush seems to do well in a structured residential setting and that he has an immature judgment but a sophisticated criminal attitude. Johnson also testified that Bush's peer associations had been a very negative influence on him. Johnson characterized Bush as both socially and emotionally immature. Johnson clarified that none of Bush's prior involvement with juvenile court related to felony-level crimes.

**{¶36}** Following Johnson's testimony, the prosecution also introduced Bush's Champaign County Court records and then rested. The defense called no witnesses.

**{¶37}** In the June 29, 2021 judgment entry granting the prosecution's motion to transfer jurisdiction, the juvenile court addressed all of the R.C. 2152.12(D) and (E) factors in a detailed opinion. The juvenile court found that, under R.C. 2152.12(D), factors (D)(1), (D)(5), (D)(6), (D)(7), (D)(8), and (D)(9) were applicable to this case and favored transfer. We have reviewed those findings of the

trial court and, notwithstanding Bush's argument to the contrary, those findings and the juvenile court's analysis thereof are supported by the record.

{¶38} The juvenile court then analyzed all of the R.C. 2152.12(E) factors weighing against transfer and found that none of those factors were applicable in this case. Upon our own review of those factors and the record of the juvenile court proceedings, we again do not find that the trial court erred in that determination.

{¶39} As noted above, when weighing those and any other relevant factors, the juvenile court has wide latitude in determining whether it should retain or relinquish jurisdiction over a juvenile, and the court's decision will not be reversed absent an abuse of discretion. Here, the evidence established that Bush actively participated in a number of very serious crimes during which a firearm was both brandished and used and, as a result of which, two persons were killed. While Bush was charged under a complicity theory, the juvenile court received evidence that Bush had admitted to police that he had the firearm during the home invasion. The evidence established that Bush had a five-year history of involvement with the juvenile justice system and that a number of options for treatment and rehabilitation had been unsuccessfully tried with him, including being placed on probation at least two times, spending time in the juvenile detention center, ankle monitoring, no-contact orders, apology letters, 90 days in detention in the CRC program, counseling, office visits, home visits, school visits, and in-home therapy. Given Bush's age and background, it was not unreasonable for the juvenile court to

conclude there was not sufficient time left to rehabilitate Bush in the juvenile system. Similarly, the trial court's determination that there was no reasonable assurance of public safety if Bush was to be kept in the juvenile justice system was also supported by the facts before the court.

{¶40} While it was the professional opinion of Dr. Bergman in her report following Bush's forensic examination that he could be rehabilitated in the juvenile system, we note that "a juvenile court is not bound by any expert opinion, and may assign *any* weight to the expert opinion that it deems appropriate." (Emphasis *sic*.) *State v. Everhardt*, *supra*, at ¶ 43, citing *State v. Easley*, 10th Dist. Franklin Nos. 16AP-9 and 16AP-10, 2016-Ohio-7271, ¶ 15. "Ohio appellate courts have routinely affirmed discretionary transfer determinations even where experts have opined that the juvenile is not mature enough for transfer or opined that the juvenile was otherwise amenable to rehabilitation in the juvenile justice system. *Id*., citing *State v. Morgan*, 10th Dist. Franklin No. 13AP-620, 2014-Ohio-5661, ¶ 37; *Easley* at ¶ 15; *State v. Reeder*, 10th Dist. Franklin Nos. 15AP-203 and 15AP-218, 2016-Ohio 212 ¶ 24; *State v. Marshall*, 1st Dist. Hamilton No. C-150383, 2016-Ohio-3184, ¶ 21.

{¶41} In summary, as the juvenile court considered the appropriate statutory factors and because there is a rational basis in the record to support the court's findings in applying those factors, the juvenile court's decision to relinquish jurisdiction was not an abuse of discretion and must be upheld on appeal.

{¶42} The first assignment of error is overruled.

*Second Assignment of Error*

{¶43} In the second assignment of error, Bush argues that the trial court erred in granting the prosecution's motion to revoke the plea agreement and thereby setting aside Bush's guilty plea. Specifically, Bush argues that the revocation of the plea was prematurely authorized by the trial court before there had been any breach of the plea agreement by Bush.

{¶44} The record reflects that on November 10, 2021, Bush entered a negotiated plea of guilty to Count 1 of the indictment as originally charged (Complicity to Aggravated Burglary, with a 3-year firearm specification) and to Count 2 (Complicity to Aggravated Robbery), without the firearm specification. Pursuant to the terms of the negotiated plea arrangement, Bush agreed to testify truthfully against his co-defendants and the parties agreed to make a joint sentencing recommendation of 20 to 25 years in prison, with Bush's sentencing hearing to be deferred until the cases pending against his co-defendants were resolved. Finally, the prosecution agreed to dismiss the remaining five counts of the indictment and the specification on Count 2, but those dismissals were to be held in abeyance until Bush's sentencing hearing took place.

{¶45} On April 25, 2022, the two attorneys who had initially been appointed to represent Bush filed a motion to withdraw as counsel. In that motion, Bush's attorneys represented that on April 7, 2022, they met with Bush at the Logan County

Jail, at their client's request. The motion asserted that, "[a]fter speaking to the Defendant about the merits of his case post-plea and the possible implications and consequences of his decisions at the current moment, it became very abundantly clear that there was a complete breakdown of communication on material facts and likely repercussions of the Defendant's strong desires about his previous pleas of guilty. A complete lack of trust of undersigned counsel by Defendant has emerged which has rendered undersigned counsel unable to continue representation." (Motion to Withdraw as Counsel, Docket No. 41).

{¶46} On May 26, 2022, a hearing was held on defense counsel's motion to withdraw. At that time, defense counsel reiterated the facts set forth in their motion to withdraw as counsel, noting that communication with Bush had reached an impasse. Upon inquiry by the trial court, Bush indicated that he agreed with the representations made by counsel. By judgment entry filed that same date, the trial court granted the motion to withdraw and appointed new counsel to represent Bush.

{¶47} On June 17, 2022, Bush filed a motion to withdraw his guilty plea. In that motion, Bush asserted that he had not been properly advised of his rights and the consequences of his plea by his prior counsel and that, as he had not yet been sentenced, Crim.R. 32.1 dictated that the trial court should freely permit the withdrawal of the guilty plea.

{¶48} On June 24, 2022, while the motion to withdraw the guilty plea was still pending, Bush filed a notice stating that, upon the trial court granting the motion

to withdraw the guilty plea, Bush was also withdrawing his previously entered waiver of speedy trial. Also on June 24, 2022, Bush filed a motion requesting release of his forensic interview in the juvenile court proceedings, and moved the trial court for an order that the bind-over hearing be transcribed. In support of those motions, Bush asserted that the information contained in the forensic evaluation "will be crucial" in filing a motion to suppress and that a transcription of the testimony from the bind-over hearing was "essential to his defense" in the case. (Motion for Release of Forensic Interview; For Transcript of Bind Over Hearing, Docket No. 51).

{¶49} On July 14, 2022, the state filed a response in opposition to the plea withdrawal motion. In that response, the prosecution asserted that Bush's reasons for seeking to withdraw his plea were vague and not supported by citation to any specific portion of the plea record. The state noted that Bush had agreed to testify against his co-defendants as part of the plea agreement, and noted that two co-defendants had pled guilty and a third was set to go to trial in early August. The state asserted that it was entitled to specific performance by Bush as to the agreements constituting the negotiated plea, and requested that the motion to withdraw the guilty plea be denied.

{¶50} On July 14, 2022, a hearing was held on Bush's motion to withdraw his plea.

**{¶51}** On July 18, 2022, the trial court filed a judgment entry denying Bush's motion to withdraw his plea, noting that a hearing had been held on the motion on July 14, 2022 and finding that, while Bush had testified at the hearing, he did not otherwise produce any evidence to support his motion. After reviewing the record and all other applicable factors, the trial court determined that withdrawing the guilty plea was not justified pursuant to Crim.R. 32.1. In reaching that decision, the trial court found that, based on Bush's testimony at the hearing, the real reason for moving to withdraw the plea was that Bush had had a change of heart about testifying against his cousin, co-defendant Ethan Grim, and was attempting to free himself of the obligation to do so contained in the plea agreement.

**{¶52}** On August 2, 2022, the prosecution filed a motion to revoke the plea agreement, on the grounds that (1) it was an express term of the plea agreement that Bush testify truthfully against any co-defendant at trial; (2) Bush had recently attempted to withdraw his guilty plea; (3) Bush testified at the July 14, 2022 hearing that he would not testify against his co-defendant Ethan Grim; and (4) after that hearing, Bush made multiple phone calls from the jail to family and friends and indicated in those calls that he would not testify at Grim's trial, or would testify untruthfully if forced to take the stand.

**{¶53}** Later on August 2, 2022, the trial court filed a judgment entry finding that Bush had breached the plea agreement and granting the state's motion to revoke the plea agreement.

**{¶54}** It is well established that principles of contract law are generally applicable to the interpretation and enforcement of plea agreements. *See, e.g., Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971); *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, ¶ 50. In particular, the decision of the United States Supreme Court in *Santobello* "stands for the proposition that plea bargaining is akin to contract law principles in that both parties bargain for an agreement and, accordingly, if one side breaches the agreement, the other side is entitled to either rescission or specific performance of the plea agreement." *State v. Bonner*, 3d Dist. Defiance Nos. 4-04-05, 4-04-06, 4-04-07, 2004-Ohio-6043, ¶ 16. "The choice of a remedy upon a breach of the plea agreement rests within the sound discretion of the trial court." *State v. Snider*, 3d Dist. Shelby No. 17-15-08, 2016-Ohio-1576, ¶ 7.

**{¶55}** In *Southeast Land Dev., Ltd. v. Primrose Mgt., L.L.C.*, 193 Ohio App. 3d 465, 2011-Ohio-2341, at ¶ 7, this Court expounded upon the contract principles of anticipatory breach of contract and repudiation, as follows:

> Where one party to a contract refuses to perform under the terms of the contract, an anticipatory repudiation is said to occur. *Blake Homes, Ltd. v. FirstEnergy Corp.,* 173 Ohio App.3d 230, 2007-Ohio-4606, 877 N.E.2d 1041. An anticipatory breach of contract by a promisor is a repudiation of the promisor's contractual duty before the time fixed for performance has arrived. *Metz v. Am. Elec. Power Co., Inc.,* 172 Ohio App.3d 800, 2007-Ohio-3520, 877 N.E.2d 316. An anticipatory breach of contract is one committed before the time has come when there is a present duty of performance and is the outcome of words or acts evincing an intention to refuse performance in the future. *McDonald v. Bedford Datsun* (1989), 59 Ohio App.3d 38, 570

N.E.2d 299. An anticipatory breach of contract must be an unequivocal repudiation of the contract. *Sentinel Consumer Prod., Inc. v. Mills, Hall, Walborn & Assoc., Inc.* (1996), 110 Ohio App.3d 211, 673 N.E.2d 967. * * * "Repudiation" of a contract is (1) a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach, or (2) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach. *White Hat Mgt. L.L.C. v. Ohio Farmers Ins. Co.,* 167 Ohio App.3d 663, 2006-Ohio-3280, 856 N.E.2d 991. * * *

**{¶56}** Thus, once one party to a contract clearly indicates, through words or actions, that the party is not going to perform its contractual obligations, the other party can immediately claim a breach of contract, based on the principles of anticipatory breach of contract and repudiation.

**{¶57}** In the instant case, Bush claims that the trial court erred in revoking the plea agreement because Bush had not yet actually breached the plea contract by failing to testify against his co-defendant. Bush argues that the state's proper remedy was to commence the co-defendant's trial, call Bush to the stand and, then, if Bush refused to testify, the prosecution could have appropriately asserted a breach of the plea agreement. We disagree, as Bush's argument overlooks the well-established principles of anticipatory breach of contract and repudiation discussed above.

**{¶58}** Contrary to Bush's argument on appeal that no breach of the negotiated plea arrangement had occurred, the record in this case establishes that, by both word and deed, Bush had unequivocally repudiated the plea agreement prior

to the state filing the motion to revoke the negotiated plea. Specifically, as detailed above, Bush first ceased communication and cooperation with his original attorneys on the issue of the negotiated plea he had previously entered, which resulted in that counsel withdrawing from the representation. Then, once represented by new counsel, Bush filed a motion to withdraw his guilty plea. While that motion was still pending, Bush filed a notice that he intended to revoke his speedy trial waiver, he moved for the release of the juvenile court forensic examination on the basis that it was crucial in order to file a motion to suppress, and he requested that the juvenile bind-over hearing be transcribed, asserting that information to be essential to his defense. All of those actions quite plainly indicated that Bush did not anticipate seeing the terms of the negotiated guilty plea through to its resolution but, rather, that he was anticipating going to trial or otherwise defending himself against the charges in the indictment. Finally, as noted by the trial court in its judgment entry of July 18, 2022, Bush testified at the July 14, 2022 hearing on his motion to withdraw the guilty plea that he would not testify against his co-defendant Ethan Grim.

{¶59} Based on all of those facts, and particularly on Bush's specific representation under oath that he would not testify against his co-defendant, the trial court did not err in finding that Bush had breached the terms of the negotiated plea agreement and in then rescinding the plea agreement as a result.

{¶60} The second assignment of error is overruled.

*Third Assignment of Error*

**{¶61}** In the third assignment of error, Bush asserts that the trial court erred in overruling the motion to suppress filed by Bush with regard to a statement he made to police following his arrest.

**{¶62}** The record reflects that Bush filed a motion to suppress on August 15, 2022, in which he sought exclusion of his statement at trial on the basis that, as a juvenile, he lacked the capacity to understand the *Miranda* warnings given to him and the consequences of waiving those rights. He further asserted that he was denied access to his guardian prior to being questioned by police.

**{¶63}** A suppression hearing was held on September 2, 2022. On September 26, 2022, after both parties filed written arguments in support of their positions, the trial court filed a judgment entry denying the motion to suppress.

**{¶64}** "Appellate review of a motion to suppress presents a mixed question of law and fact." *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. The trial court serves as the trier of fact and is the primary judge of the credibility of the witnesses and the weight to be given to the evidence presented. *State v. Johnson,* 137 Ohio App.3d 847, 850 (12th Dist.2000). Therefore, when an appellate court reviews a trial court's ruling on a motion to suppress, it must accept the trial court's findings of fact so long as they are supported by competent, credible evidence. *State v. Roberts,* 110 Ohio St.3d 71, 2006–Ohio–3665, ¶ 100. The appellate court must then review the application of the law to the facts de novo. *Burnside* at ¶ 8.

{¶65} In the instant case, the trial court reviewed the evidence presented at the suppression hearing and made the following findings of fact in its judgment entry overruling the motion to suppress:

> On November 28, 2019, Madison County Sheriff deputies apprehended Defendant and [co-suspect] Grim at a residence in Madison County and took them to the Madison County Sheriff's Office. The Madison County Sheriff's Office notified the BPD that Defendant and Grim had been apprehended.
>
> Detectives Comstock and Salyer drove to Madison County to interview Defendant.
>
> At the time of the [crimes at issue] and interview, Defendant was 16.5-years old.
>
> Detectives Comstock and Salyer met with Defendant in an interview room. The interview was video-recorded. *See* Exhibit 4. Detective Comstock provided Defendant with an advice of rights form and verbally reviewed the form with him. Defendant signed and dated the form, which expressed his consent to waive his *Miranda* rights. *See* Exhibit 3.
>
> The interview started at 16:53 of the video (4:53 PM). Defendant was seated at a table across from Detectives Comstock and Salyer. The Detectives were calm. Defendant was calm, but nervous. Defendant informed the detectives that his grandma, Robin Pena (Pena), was his custodian and discussion followed:
>
> Detective Comstock: We got some questions for you, dude.
> Defendant: Is my grandma here?
> Detective Comstock: Grandma?
> Defendant: Yeah, she is my custodian. She told them I was not to be questioned until she was around. But she probably couldn't make it, so that's alright.
> Detective Comstock: So, are you not wanting to talk to us?
> Defendant: No, I was just asking if she was here.
> Detective Comstock: Not yet, that we know of.
> Defendant: She probably ain't going to make it. She's in Urbana.

Detective Comstock then reviewed Defendant's rights, including his right to remain silent. Defendant indicated to Detective Comstock that he understood his rights and signed the advice of rights form waiving his right to remain silent. The detectives then proceeded to interview Defendant.

Pena testified that on the night of the shootout, she was contacted at her home by officers with the Urbana Police Department. She testified that she "kind of casual" told the officers not to question Defendant until she was available. She testified she did not remember the name of the Urbana officers with whom she communicated. She also testified that she told officers of the London Police Department not to question Defendant until she and/or an attorney was present. Again, she did not remember the London Police Department officers with whom she communicated. Other than her testimony, no evidence was presented of any involvement of the London Police Department in the investigation of the shootout.

At 17:11 of the video (5:11 PM), the following discussion occurred:

Defendant: And there's people who are telling you I was the one?
Officer Comstock: Are you 16 or 17?
Defendant: 16
Officer Comstock: We're not trying to be bad guys here, man. We're just trying to get down to the bottom…
Defendant: Will you tell me where I will be going after this?
Officer Salyer: You'll come with us to Logan County. I mean there is nothing we can do about that. I mean it is what it is.
Defendant: You know what they're going to do with [co-defendant] Ethan [Grim]? Same thing?
Detective Salyer: Um-hmm. And [co-defendant] Elijah [Barrett]. You know you guys were friends since two-years old. And to leave him out there like that…
Detective Comstock: I mean if it was a mistake, man, it's a mistake.
Defendant: But I didn't do nothing. That's what you don't understand.
Detective Salyer: That's what we don't understand because we're not hearing your version of it. So, we can't understand it. I mean a kid that you knew since two has a hole in his leg.
Defendant: And people are telling you I was the one?

-28-

Detective Salyer: Yeah, and we're not blowing smoke. You know you leave somebody high and dry that cuts deep.

Defendant: Yeah. I think I'm done with questions.

Detective Comstock: You think you're done, or you're done?

Defendant: I'm done.

Detective Salyer: Alright. Well, we want to let you know that you're charged with murder, and you're charged with aggravated robbery. That's to start. OK. There will be more of those coming.

Defendant: I didn't do it. I didn't fucking do it, bro. I can't believe they did this to me.

Detective Salyer: Do you know the reason I'm saying there is more coming?

Defendant: Yeah. Do you mind telling me who said the gun was in my hand?

Detective Comstock: No, just like we don't go around telling everybody what you said either, man.

Detective Salyer: And the reason I'm saying there's more coming, if we never have your version, is because the other kid is probably not going to make it.

Defendant: What other kid?

Detective Salyer: There were two people shot. One died right there on the floor. The other one has been fighting for his life ever since. But it does not look good. It does not look good.

Defendant: And they're saying I had a gun in my hand?

Detective Salyer: Who?

Defendant: I am asking you. They saying I had a gun in my hand?

Detective Salyer: Yeah, I'm being straight with you. Like I said, I'm not here to play games.

Detective Comstock: You want to continue to talk to us and settle this or what, man? Do you want to tell us your story? By what you're going through right now, it looks like you got something you need to say.

Defendant: Oh, I do.

Detective Comstock: Maybe you weren't the biggest part of this.

Defendant: No.

Detective Comstock: So, that's something we need to know. First of all, you need, do you need…

Defendant: I was the smallest part of this, bro.

Detective Comstock: What's that?

Defendant: I was the smallest part of this.

Detective Salyer: Well, tell us more about that.

Defendant: I can't do it.
Detective Comstock: Because if you don't do it, what does that make you? We have to go on what we have.

Defendant continued to talk with the detectives about the events of November 27, 2019. He asked the detectives when he would receive a discovery packet. He asked to see the warrant and Detective Salyer provided it to him. Defendant observed his name was misspelled in the warrant.

At 17:33 (5:33 PM) of the video Defendant said, "I'm debating over here whether I want to snitch, bro, to save my ass, bro or just take it."

At 17:38 (5:38 PM) of the video, Detective Comstock asked Defendant, "Did Eli actually get a little bit of weed? Did he buy what he came there for?" Defendant gave an inaudible response. Detective Comstock said, "We're not concerned about a little bit of marijuana. But did that actually happen? Before things got out of hand." Defendant responded, "No. I need an attorney." The detectives immediately ended the interview.

After the interview ended, the detectives put Defendant in handcuffs. Detective Salyer testified as the Madison County Sheriff personnel was taking Defendant out of the room, Defendant volunteered to go back and talk to the detectives. Detective Salyer testified Defendant told him that he was the one with the gun and everything he had told them in the interview was a lie.

Detective Salyer testified that the detectives did not make any threats or promises to Defendant during the interview or at any other time.

The State introduced evidence that Defendant had contact with police 17 times between 2014 and 2019. On August 18, 2017, Urbana police interviewed Defendant about his alleged assault of another student. During the questioning, Defendant asserted his right to an attorney and the Urbana police ended the interview.

(Judgment Entry Denying Defendant's Motion to Suppress, Docket No. 119, p. 2-5, paragraph numbering omitted).

**{¶66}** In its decision, the trial court additionally found that "[d]efendant was only 16.5-years old and Pena and his mother, Richele Grim, testified Defendant has had difficulty in school and with his mental and emotional health." (*Id.*, p. 8). The trial court went on to note, "[h]owever, in the December 28, 2020, juvenile bindover report that Defendant introduced as Defendant's Exhibit 1, Dr. Barbara [*sic*] Bergmann [*sic*] found a mental status examination 'indicated that [Defendant's] mental status is essentially within normal limits in terms of psychiatric stability.'" (*Id.*). The trial court further directly quoted an extensive portion of that report in which no issues were noted with Bush's thought processes, concentration, mood, or memory, and in which his level of intellectual functioning was estimated to be in an average range. (*Id.*).

**{¶67}** The trial court concluded its findings of fact as follows:

> The Court finds Defendant exhibited the same demeanor and character during his interview with Detectives Comstock and Salyer. While anxious, Defendant considered his options. He calculated his best interests. He knew how to demand an attorney. But he did not do so until the end of an interview. When he indicated to the detectives he was "done" at the 17:13 (5:13 PM) mark of the video, he immediately initiated conversation that showed a willingness and a desire for further discussion of the crime. When Detective Comstock observed that he looked like he had something he needed to say, Defendant responded, "Oh, I do." Defendant also told the detectives he was debating whether to snitch or to just take it. After doing so he continued to talk with the detectives. The Court finds and concludes Defendant's conduct showed a willingness and a desire to continue talking to the detectives about the events of November 27, 2019.

(*Id.*, p. 9).

**{¶68}** Our review of the trial court's findings of fact, based on the evidentiary record before the trial court, reflects that the lower court's findings are supported by competent, credible evidence and, therefore, we must accept those findings. *State v. Roberts*, *supra*, at ¶ 100.

**{¶69}** As required, we now turn to a de novo review of the application of the law to those facts. *Burnside*, *supra*, at ¶ 8.

**{¶70}** In *State v. Barker*, 149 Ohio St.3d 1, 2016-Ohio-2708, at ¶ 21-24, the Supreme Court of Ohio set forth the law applicable here as follows:

> The Fifth Amendment to the United States Constitution guarantees that "'[n]o person * * * shall be compelled in any criminal case to be a witness against himself,'" and the Sixth Amendment guarantees that "'the accused shall * * * have the Assistance of Counsel.'" (Ellipses sic.) *Miranda* [*v. Arizona*]*,* 384 U.S. [ 436] at 442, 86 S.Ct. 1602, 16 L.Ed.2d 694. The inherently coercive nature of custodial interrogation heightens the risk that a suspect will be denied the Fifth Amendment privilege not to be compelled to incriminate himself because custodial interrogation can "'undermine the individual's will to resist and * * * compel him to speak where he would not otherwise do so freely.'" (Ellipsis sic.) *J.D.B. v. North Carolina,* 564 U.S. 261, 269, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (2011), quoting *Miranda* at 467, 86 S.Ct. 1602; *Dickerson v. United States,* 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000). That risk is even more troubling and acute when, as here, the subject of the interrogation is a juvenile. *J.D.B.* at 269.
>
> In light of the inherent coercion involved in custodial interrogation, *Miranda* established "a set of prophylactic measures" to safeguard the constitutional privilege against self-incrimination. *Id.* In broad terms, *Miranda* held that the state may not use a defendant's statements from custodial interrogation "unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda* at 444, 86 S.Ct. 1602. Prior to questioning, the police must warn the suspect "that he has a right to remain silent,

that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Id.* The Supreme Court recognized the importance of a suspect's "real understanding" of his rights and his intelligent decision whether to exercise them. *Id.* at 469, 86 S.Ct. 1602.

If custodial interrogation continues in the absence of an attorney after a police officer advises a suspect of his rights, the government bears "a heavy burden" to demonstrate by a preponderance of the evidence that the suspect "knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel" before speaking to the police. *Miranda,* 384 U.S. at 475, 86 S.Ct. 1602, citing *Escobedo v. Illinois,* 378 U.S. 478, 490, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), fn. 14; [*Colorado v.*] *Connelly,* 479 U.S. [157] at 169, 107 S.Ct. 515, 93 L.Ed.2d 473. *See also State v. Treesh,* 90 Ohio St.3d 460, 470, 739 N.E.2d 749 (2001) (recognizing requirement of knowing, intelligent waiver). A court may not presume a valid waiver either from the suspect's silence after warnings are given or from the fact that the suspect eventually confessed. *Miranda* at 475, 86 S.Ct. 1602, 16 L.Ed.2d 694. Rather, the record must show "'that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver.'" *Id.,* quoting *Carnley v. Cochran,* 369 U.S. 506, 516, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962). If the state does not satisfy its burden, "no evidence obtained as a result of interrogation can be used." *Id.* at 479, 86 S.Ct. 1602.

To determine whether a suspect knowingly, intelligently, and voluntarily waived his *Miranda* rights, courts examine the totality of the circumstances. *State v. Clark,* 38 Ohio St.3d 252, 261, 527 N.E.2d 844 (1988). When the suspect is a juvenile, the totality of the circumstances includes "the juvenile's age, experience, education, background, and intelligence" as well as his "capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare v. Michael C.,* 442 U.S. 707, 725, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979). A juvenile's access to advice from a parent, guardian or custodian also plays a role in assuring that the juvenile's waiver is knowing, intelligent, and voluntary. *See In re C.S.,* 115 Ohio St.3d 267, 2007-Ohio-4919, 874 N.E.2d 1177, ¶ 96.

{¶71} Applying those legal principles to the facts in this case, we conclude that the trial court did not err in rejecting Bush's claim that, as a juvenile, he lacked the capacity to understand the *Miranda* warnings given to him and the consequences of waiving those rights. Because Bush was a juvenile, the trial court appropriately considered Bush's "age, mental state, prior criminal experience, the length of the interview, the frequency of interrogation, and the existence of physical deprivation or mistreatment." (Judgment Entry Denying Defendant's Motion to Suppress, Docket No. 119, p. 8).

{¶72} As the trial court accurately determined, Bush was over sixteen years of age, the 45-minute interview was of reasonable length, and the detectives initiated only a single interview. While a juvenile, Bush had extensive prior experience with law enforcement and had previously demonstrated the mental acumen necessary to understand and invoke his constitutional rights during questioning by police. There was no evidence of physical deprivation or mistreatment in this case.

{¶73} We further note that, at the beginning of the interview, when Bush mentioned that his grandmother had told "them" that he was not to be questioned until she arrived, and the detective asked, "So are you not wanting to talk to us?", Bush actually replied "No, I'm not saying that." That assertion was omitted from the trial court's written review of the recorded conversation, but provides further support to the trial court's determination that Bush intelligently and voluntarily

waived his rights and was not seeking to have his grandmother present prior to questioning.

{¶74} Upon a review of the totality of the circumstances here, including but not limited to the specific factors relevant to juveniles, the record supports the conclusion that Bush knowingly and intelligently waived his *Miranda* rights after being fully advised of the same, and that he voluntarily submitted to the questioning by law enforcement.

{¶75} Next, Bush argues that he revoked any initial waiver of his rights and reasserted his right to remain silent while he was being questioned. In support of this claim, Bush points to the portion of the interview where he said, "I think I'm done with questions", to which the detective asked, "You think you're done, or you're done?", and Bush replied, "I'm done."

{¶76} With respect to this claim, we note that once a suspect invokes the right to remain silent or the right to have counsel present during an interrogation, "all further questioning 'must cease and may not be resumed in the absence of counsel unless the [suspect] thereafter [executes] a valid waiver or himself renews communication with police.'" *State v. Ream*, 3d Dist. Allen No. 1-12-39, 2013-Ohio-4319, ¶ 65, quoting *State v. Knuckles,* 65 Ohio St.3d 494, 605 N.E.2d 54 (1992), paragraph one of the syllabus. "This rule applies even where the suspect executed a *Miranda* waiver before invoking his right to counsel." *Id*., citing *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981).

{¶77} Thus, once a defendant in custody invokes his *Miranda* rights, no further interrogation is permitted unless the defendant initiates further conversation with law enforcement. *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, ¶ 51, citing *Edwards v. Arizona*, *supra*. A defendant "initiates" conversation when his statements show "a willingness and a desire" for further discussion about the crime. *Id.*, citing *Oregon v. Bradshaw*, 462 U.S. 1039, 1043–1044, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983).

{¶78} In *Bradshaw*, the defendant asserted his *Miranda* rights and police ceased questioning him. While being transported to jail, the defendant then asked an officer, "Well, what is going to happen to me now?" *Id.* at 1042. A plurality of the United States Supreme Court reasoned that this question was sufficient to constitute initiation of generalized discussion about the case, finding:

> Although ambiguous, the respondent's question in this case as to what was going to happen to him evinced a willingness and a desire for a generalized discussion about the investigation; it was not merely a necessary inquiry arising out of the incidents of the custodial relationship. It could reasonably have been interpreted by the officer as relating generally to the investigation. * * *

*Id.* at 1045–1046.

{¶79} In the instant case, the record reflects that when Bush invoked his right to remain silent, the detectives stopped asking questions and began concluding their session with Bush by informing him of the crimes and potential crimes for which he was being arrested. Bush instantly began speaking again about the home

invasion itself, denying his participation. Bush next asked a question about the second victim, which Detective Salyer answered, and then Bush immediately switched focus and began asking questions again about the investigation of the crimes at issue. In response to those questions, Detective Comstock then asked Bush if he wanted to continue to talk, and Bush replied that he did.

**{¶80}** Accordingly, we find that the trial court did not err in determining that Bush at that point had initiated further conversation with the detectives about the case and manifested the intent to waive his right to remain silent and continue speaking with the officers.

**{¶81}** Finally, we also reject Bush's claim that his waiver of *Miranda* rights was involuntary or that he was deprived of his Fifth Amendment right to remain silent or his right to counsel under the Sixth Amendment on the basis that he was denied access to his guardian prior to questioning, after his grandmother had indirectly requested that he not be questioned until she or an attorney could be present.

**{¶82}** As the Supreme Court of Ohio explained in *State v. Williams*, 99 Ohio St.3d 439, 2003-Ohio-4164, at ¶ 29:

> The Fifth Amendment right against self-incrimination is a personal right "that can only be invoked by the individual whose testimony is being compelled." *Moran v. Burbine* (1986), 475 U.S. 412, 433, 106 S.Ct. 1135, 89 L.Ed.2d 410, fn. 4 (during interrogation, police rebuffed attorney who had been hired by a Mirandized suspect's sister, where suspect had not requested assistance of counsel). Accord *State v. Benner* (1988), 40 Ohio St.3d 301, 310, 533 N.E.2d 701; *State*

*v. Carder* (1966), 9 Ohio St.2d 1, 7, 38 O.O.2d 1, 222 N.E.2d 620 ("The determinative factor * * * is the desire of the accused to consult with counsel, not the desire of counsel to consult with the accused"). See, also, *Ajabu v. Indiana* (Ind.1998), 693 N.E.2d 921, 932, 96 A.L.R.5th 669 (*Miranda* does "not give a lawyer control over the interrogation unless the suspect requests it").

**{¶83}** Thus, a family member or even an attorney cannot invoke a suspect's Fifth or Sixth Amendment rights because such rights are personal to the suspect. This principle is true even if the third-party had asked police not to question the suspect. *Williams*, at ¶ 30.

**{¶84}** For all of the reasons stated, the trial court did not err in overruling Bush's motion to suppress. The third assignment of error is overruled.

*Fourth Assignment of Error*

**{¶85}** In the fourth assignment of error, Bush argues that his Sixth Amendment right to confront witnesses was violated when the trial court permitted witnesses to testify concerning prior statements made by co-defendant Austin Allen, who did not testify at trial.

**{¶86}** Generally, the admission or exclusion of evidence lies within the trial court's discretion, and a reviewing court should not reverse absent an abuse of discretion. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 62. "However, we review de novo evidentiary rulings that implicate the Confrontation Clause." *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 97. "De novo review is

independent, without deference to the lower court's decision." *State v. Hudson*, 3d Dist. Marion No. 9-12-38, 2013-Ohio-647, ¶ 27.

**{¶87}** The Confrontation Clause of the Sixth Amendment to the United States Constitution, made applicable to the states by the Fourteenth Amendment, provides that "'[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him * * *.'" *Crawford v. Washington*, 541 U.S. 36, 42, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), quoting the Confrontation Clause. *See also State v. Maxwell*, 139 Ohio St.3d 12, 2014-Ohio-1019, ¶ 34. The United States Supreme Court has interpreted the right of confrontation to mean that admission of an out-of-court statement of a witness who does not appear at trial is prohibited by the Confrontation Clause if the statement is testimonial, unless the witness is unavailable and the defendant has had a prior opportunity to cross-examine the witness. *Maxwell* at ¶ 34, citing *Crawford* at 53-54.

**{¶88}** In *Crawford*, the United States Supreme Court "did not define the word 'testimonial' but stated that the core class of statements implicated by the Confrontation Clause includes statements 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Maxwell* at ¶ 35, quoting *Crawford* at 52. One thing made clear in *Crawford*, however, is that statements made during the course of a police interrogation fall under the umbrella of "testimonial statements." *Crawford* at 68,

(testimonial statements at a minimum include "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations").

**{¶89}** Not all statements made in response to police questioning are deemed testimonial. Rather, statements made during a police interview become testimonial when "the circumstances objectively indicate that there is no * * * ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

**{¶90}** In the instant case, the prosecution's evidence at trial reflected that Austin Allen was an accomplice in the crimes at issue, having been present on the evening in question with Bush and the other two perpetrators, Elijah Barrett and Ethan Grim, while the home invasion was being planned, and then having driven the three primary perpetrators to and from the residence where the home invasion occurred.

**{¶91}** At trial, the issue of the admissibility of prior out-of-court statements made by Allen first arose when prosecution witness Mason Fox was on the stand. Fox testified as to Allen, Bush, Barrett, and Grim being present at Fox's apartment on the evening of November 27, 2019, and to the fact that Allen borrowed Fox's car and then the four left Fox's apartment. Fox testified that he did not see the four again that night but that Allen showed up at Fox's door the next morning, asking for a ride, and Fox told Allen the police were looking for him.

{¶92} At that point in Fox's testimony, the prosecutor asked Fox, "When you told Austin that the police were looking for him, how did he respond?" (Tr., 481). Fox answered, "He was pretty upset. He was crying, trying to explain things through the door at me, trying to tell me, like, they were making him do it." (*Id.*).

{¶93} Defense counsel lodged an objection on the basis of hearsay, to which the prosecutor responded, "Statement against interest. Witness is unavailable." (*Id.*). The trial court overruled the objection, and ruled that Fox could answer the question. Fox then continued to testify, but a review of his remaining testimony reflects that he did not actually testify as to the specific content of any statements made by Allen.

{¶94} Following Fox's testimony, the prosecution presented a number of other witnesses, and then called Detective Dwight Salyer to the stand as the state's final witness. Salyer testified about his involvement in the investigation of the home invasion, and about evidence turned up by law enforcement during that investigation, including a recorded statement made by Bush in which he admitted participation in the home invasion. Then, during the remainder of Salyer's time on the stand, the detective testified to, among other things, several out-of-court statements made by Austin Allen.

{¶95} First, as the state was eliciting testimony concerning a statement made by Bush about the driver of the vehicle, the prosecutor asked Detective Salyer, "And Austin Allen actually admitted to driving the car; is that correct?", to which Salyer

-41-

answered, "Yes, he did." (Tr., 644). Then, after additional testimony from Salyer about various other aspects of the investigation, the following testimony was introduced:

> Q. [by PROSECUTOR]: Now, you heard Mason Fox testify yesterday that he told Austin Allen to turn himself in. Did Austin Allen do that?
>
> A: [by DET. SALYER]: Yes, he did.
>
> Q: What part did he play?
>
> A: He said he was the driver that took Josia Bush, Ethan Grim, and Elijah Barrett to 601 West Columbus. He also said he picked them up – he picked Josia Bush and Ethan Grim up in Urbana earlier in the day.
>
> Q: Did he say anything about cleaning out the car afterwards?
>
> A: Yeah, he said he did try to clean the car that day.
>
> Q: And Austin Allen is also charged with the same things as Josia, Ethan, and Elijah?
>
> A: Yes, he is.

(Tr., 653-654).

{¶96} While the precise circumstances under which Austin Allen made that statement to police are not reflected by the record, it is clear from the context of Detective Salyer's overall testimony that the statement was made to police by Allen while being interviewed following his arrest, after a formal police investigation had been initiated and was ongoing.

-42-

**{¶97}** Under such circumstances, we find that Allen's statements to Detective Salyer were testimonial—there was no ongoing emergency and the statement was the result of a police interrogation whose "primary purpose [was] to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington, supra*, at 822. Because Allen's statements were testimonial, they were only admissible if he was unavailable, which was not established by the record before us, and then only if Bush had a prior opportunity to cross-examine Allen. *Crawford, supra*, at 541. ("Where testimonial evidence is at issue, however, the Sixth Amendment demands * * * unavailability and a prior opportunity for cross-examination."). As neither of those circumstances were present here, the admission at trial of Allen's interview statements to police violated Bush's rights under the Confrontation Clause of the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

**{¶98}** Our analysis, however, does not end there. Although constitutional error occurred in admitting the statements via the detective's testimony, such error can be harmless in certain circumstances. It is well established that a constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of

might have contributed to the conviction. *Id*. at 23; *State v. Madrigal*, 87 Ohio St.3d 378, 388, 721 N.E.2d 52 (2000).

**{¶99}** With that standard in mind, we now review the material evidence presented at trial in order to determine whether the error was harmless or not.

**{¶100}** The trial testimony of prosecution witnesses Kayla Foulks, Jamie Crum, Kiley Titus, Steven Travis, and Jada Nichols collectively established the following: in November of 2019, Jamie Crum lived with her two sons, Anthony Scartz and Steven Travis, in a home at 601 West Columbus Avenue in Bellefontaine, Ohio, which is located in Logan County. Anthony was known to sell marijuana out of the home. In November of 2019, four other people were living in the house with Jamie and her sons: Kayla Foulks, who was Anthony's girlfriend; Caleb Chamberlin, a friend of Anthony's; Jada Nichols, another friend of Anthony's; and Kiley Titus, a friend of Kayla's.

**{¶101}** On November 27, 2019, the night before Thanksgiving, at approximately 11:30 p.m., four of the seven residents of 601 West Columbus Avenue were home. At that time, Kayla was relaxing on the couch in the front living room on the home's first floor, Jamie was in the first-floor bathroom, Steven was in his upstairs bedroom playing video games, and Kiley was sleeping in another upstairs bedroom. The other three residents of the home, Anthony, Caleb, and Jada, had left the house a short while before on an errand to Walmart.

{¶102} At that time, as Kayla sat by herself in the living room, three males wearing hoods and partial face coverings entered the residence through the front door, which was closed but not locked. The first male through the door had an orange firearm in his hand, which he pointed at Kayla and said, "Don't f---ing move." The three intruders moved past Kayla to the bathroom, where Jamie was located. The bathroom door was shoved open and Jamie saw a male with a hood and mask come through the door. Jamie was hit in the head with a hard, sharp object, which split her scalp open. Jamie fell into the bathtub and briefly lost consciousness.

{¶103} The gunman then returned to the living room and demanded that Kayla go upstairs. Kayla was forced to follow the gunman up the stairs, and one of the other intruders followed behind them. Once Kayla had been led upstairs, the two males immediately went into the bedroom on the right, where Kiley was sleeping on a futon. As Kayla stood at the top of the steps, she could see the male with the gun using the firearm to hit Kiley.

{¶104} Kiley was awakened by being struck in the head and by Kayla screaming. Kiley heard someone yelling at her, telling her to give them money. Kiley observed a male standing in front of her with an orange gun, and a second male was standing behind the first male. The two males were wearing hoodies and masks. Kiley then heard someone from downstairs yelling, "Cuz, cuz", and both males ran out of her bedroom to the landing at the top of the stairs. Kiley heard

gunshots, then one of the intruders fell back into the bedroom on the other side of the landing, where Steven had been playing video games. Both masked males then ran downstairs.

{¶105} Prior to that, while the male with the gun was striking Kiley, Kayla yelled for him to stop, and the gunman turned around, faced Kayla, pointed the gun several inches from her head, and demanded to know where the money was. Kayla told him that she was pregnant and did not know where any money was but he continued to demand money. Kayla then directed the gunman to a small safe that was located in a bedroom off the room where Kiley had been sleeping. Kayla showed the male with the gun that there was no money in the safe. The male then tried to open a storage tote sitting in the room, grabbed something off the top of a bucket that was also in the room, and ran out of the room. Kayla and Kiley remained upstairs, then heard gunshots, followed by Jamie yelling from downstairs.

{¶106} While the gunman had been with Kayla and Kiley in the bedrooms upstairs, Anthony, Caleb, and Jada returned home from Walmart. When the three of them walked into the house upon arriving home, there was a male wearing a mask and hood standing in the dining room. Jada heard that intruder yell out something like, "hey, cuz", and then he began moving toward the kitchen as Anthony came into the room, yelling "what the hell is going on here?". At that point, Jamie had regained consciousness and came out of the first-floor bathroom. Jamie told

Anthony that Kayla was upstairs, in response to which Anthony grabbed his own gun, which was a pink nine-millimeter.

{¶107} Gunshots then rang out. From upstairs, Kayla heard the gunshots and someone yelling, "he shot, he shot." Downstairs, Jamie saw Anthony get shot and fall to the floor at the base of the stairs. Both Jamie and Caleb then tried to reach Anthony's gun. Caleb grabbed Jamie and threw her into the kitchen, where she fell on the floor, then pulled out her phone and dialed 9-1-1. Jamie next realized that the masked men were gone, and she saw that Caleb was face-down on the dining room floor, unmoving. Jamie then began yelling for Kayla.

{¶108} From upstairs, Kayla heard Jamie yelling for her, and Kayla and Kylie went downstairs after confirming with Jamie that the intruders were gone. Kayla observed Anthony at the bottom of the steps, barely conscious, and bleeding from a head wound. Kiley went to try to help Caleb, who was unresponsive on the floor, with blood everywhere. The women locked the front door, and Kayla also called 9-1-1.

{¶109} Police and the rescue squad responded to the house. Caleb Chamberlin was declared dead at the scene. Anthony Scartz was taken to the local hospital, then life-flighted to a Columbus hospital, where he died three days later. None of the surviving victims had recognized or were able to identify any of the three males who had invaded the home that evening.

{¶110} At trial, several law enforcement officers testified about responding to the crime scene and the follow-up investigation.

{¶111} Chad Holcomb, a special agent employed by the Ohio Bureau of Criminal Investigation ("BCI"), testified that the local Bellefontaine police had requested that BCI process the crime scene. Holcomb identified numerous crime scene photos that he took in the early morning hours of November 28, 2019, after responding to 601 West Columbus Avenue. Holcomb further testified about the spent bullets and casings he located and collected at the scene, a police-style ASP baton found near Caleb Chamberlin's body, approximately $1000.00 in cash and suspected marijuana located in the living room, and the fact that swabs of blood were taken at the scene. While a magazine holster, a magazine, and an empty box for a Jimenez Arms nine-millimeter firearm were found in the authorities' search of the home, no firearms were located in the residence.

{¶112} Sergeant Andrew Kennedy of the Bellefontaine Police Department testified that on November 28, 2019, he went to the Heritage Court Apartments in Bellefontaine in an attempt to find Austin Allen, after receiving information that Allen may have been involved with the home invasion. At 817 Heritage Court, Kennedy located two witnesses, Mason Fox and Sheysa Fogle, who reported that Austin Allen had been at their apartment the previous evening and that Fox had then lent his car to Allen. Kennedy located Fox's vehicle in the apartment parking lot,

and the car was impounded after Kennedy observed what appeared to be blood on the passenger's seat and the glove box.

{¶113} Greg VanBuskirk testified that on November 27, 2019, he responded to the crime scene in his then capacity as a patrol officer with the Bellefontaine Police Department. After BCI agents finished processing the scene, the agents turned over to VanBuskirk a number of evidentiary items collected at the scene, which included six casings, a spent bullet, and a bent ASP baton. VanBuskirk also testified that Mason Fox's car had been processed, and that a cutting of the seat fabric had been taken, along with a swab of a blood smear on the glove box. VanBuskirk later collected DNA sample swabs from the four persons identified as suspects in the home invasion, which were Bush, Elijah Barrett, Ethan Grim, and Austin Allen. VanBuskirk subsequently transported those various items of evidence to BCI for testing.

{¶114} Erika Jimenez, a forensic scientist with BCI and an expert in DNA analysis, testified that she performed testing on the fabric from the front passenger seat of Mason Fox's car, that the stain on the fabric was presumptive positive for blood, and that DNA testing of that blood determined that it was consistent with Elijah Barrett's DNA. Jimenez also tested a swab taken of the car's glove box. The substance on the glove box was also presumptive positive for blood, and the DNA profile of that blood was consistent with the DNA of Elijah Barrett. Jimenez also tested a swab taken from the wall at the top of the steps in the home. The substance

on that swab was presumptive positive for blood. DNA testing of that swab revealed a mixture of DNA, with the major contributor of that DNA being consistent with the DNA of Elijah Barrett.

{¶115} Andrew McClelland, a forensic scientist and an expert in firearms analysis, testified that he analyzed six fired Luger nine-millimeter casings that had been submitted to BCI in the case. Microscopic comparison of the casings determined that there were matching individual breechface characteristics on all six casings, which confirmed that those casings had all been fired from the same firearm. McClelland also tested another nine-millimeter casing recovered from the scene, and microscopic comparison excluded that casing as having been fired from the same gun that fired the six Luger casings.

{¶116} Dr. John Daniels, a deputy coroner with the Franklin County Coroner's Office and an expert in forensic pathology, testified that he performed the autopsy of Anthony Scartz. The autopsy revealed that Scartz had been shot in the side of the head and in the left side of his back, with the cause of his death being the gunshot wound to the head.

{¶117} Dr. Mary Goolsby, a deputy coroner with the Montgomery County Coroner's Office and an expert in forensic pathology, testified that she performed the autopsy of Caleb Chamberlin. The autopsy revealed that Chamberlin had been shot in the left side of his forehead and the right side of his head, with the cause of death being the multiple gunshot wounds to the head.

{¶118} Elijah Barrett also testified for the prosecution at trial. Barrett testified that he had grown up with Bush and Ethan Grim in Urbana, and that he knew Austin Allen through his girlfriend. On November 27, 2019, Barrett got a call from Grim, and so Barrett and Allen took Mason Fox's car, drove to Urbana, and picked up Bush and Grim. Barrett testified that Bush wanted some money, and asked if Barrett had some way to get money, such as a robbery. Barrett said he told Bush and Grim that he had heard Anthony Scartz had been selling drugs in Bellefontaine.

{¶119} After Barrett and Allen picked up Bush and Grim in Urbana that evening, the four of them drove by Scartz's home in Bellefontaine, and then returned to the Heritage Court Apartments, where Barrett was living at the time. Once at the complex, the group of four ended up at Mason Fox's apartment, where they discussed doing the home invasion. Barrett testified that the plan was that he would carry the gun, which was an orange gun that Grim had brought with him from Urbana. Once in the home, the plan was that Barrett would put everybody on the ground, and the others would then go through the house to get anything of value, such as drugs or money. The four left Mason Fox's apartment with Allen driving Fox's car and then stopped at Allen's house so he could get some gloves, as the other three were already wearing gloves. Barrett testified that he, Bush, and Grim were wearing hoodies and that they covered their faces while in the car.

{¶120} Barrett testified that they then drove to 601 West Columbus, where he, Bush, and Grim entered the front door of the home. Barrett was first in the door and had the gun, Grim followed behind Barrett, and Bush was the last person through the door. Once in the house, Barrett saw a girl by the couch and told her to sit down. Barrett then saw someone walk into the bathroom, so he ran to the bathroom and kicked in the door. Barrett testified that he then hit the female in the bathroom with the gun, and put her into the bathtub. When Barrett came out of the bathroom, he found that Bush and Grim had ordered the girl by the couch to go upstairs, and so Barrett ran up the stairs ahead of them, with the girl from the living room following him up the steps.

{¶121} Once upstairs, Barrett noticed someone in bed in a room to the right of the landing, with covers over their head. Barrett testified that he freaked out, thinking maybe that person was calling the police, and so he hit that person with the gun, and it turned out to be a girl. Barrett testified that the girl who had been on the couch downstairs started going through a safe that was in a backroom off the first bedroom he had entered, but nothing was recovered from the safe.

{¶122} Barrett testified that he then began asking the girl where the money was, as Bush stood next to him. Grim then suddenly came running up and said, "he's home, give me the gun." Barrett still had the gun and he went to walk out into area at the top of the stairs, and got shot as soon as he took a step into the area. Barrett testified that after being shot in the thigh, he aimed the gun down the steps

and fired more than one shot in that direction. Barrett knew he hit a male at the bottom of the steps because he saw the male fall down.

**{¶123}** Barrett testified that once the male at the bottom of the stairway had been shot and was down, Grim ran down the steps first, and Bush then helped Barrett walk down the stairs. Barrett testified that after being shot, he thought he handed the orange gun to Bush, but was not sure of that. At the bottom of the stairway, they had to step over the man on the floor, and Grim picked up the man's gun that had been used to shoot Barrett.

**{¶124}** Barrett testified that he then looked up and saw another man with what Barrett thought was a machete, and the man was hitting Grim in the back with the item. Barrett testified he told Grim that he would shoot him, and then Grim turned around and fired two shots at the man who had been striking him in the back. Barrett testified that he, Bush, and Grim then left the house and met up with Allen, who was waiting in the car. Bush assisted Barrett in getting to the car, holding him up while he made his way to the vehicle.

**{¶125}** Once back in the car, Allen drove, with Barrett in the front passenger seat and Bush and Grim in the back. Barrett testified that he no longer had the gun, and so Bush or Grim had to have the guns. After stopping for gas, Barrett was dropped off outside a hospital in Urbana. He was ultimately care-flighted to Nationwide Children's Hospital in Columbus to be treated for his gunshot wound. While at the two hospitals, Barrett was interviewed by police. Barrett testified that

initially he told police he was shot in a drive-by shooting, but when confronted with the blood evidence at the crime scene, he later changed his story and said that he was shot during a robbery at the house in Bellefontaine while he was there trying to buy marijuana. Finally, Barrett told the police the full story.

{¶126} Barrett testified that for his role in the incident he had pled guilty to Complicity to Murder, Complicity to Felonious Assault, and Complicity to Aggravated Robbery, and had received a sentence of 25 years to life in prison. Barrett testified that, in exchange for his testimony at Bush's trial, the prosecution had agreed to inform the parole board of Barrett's cooperation.

{¶127} Bellefontaine Police Department Detective Dwight Salyer testified at trial that he was called to 601 West Columbus Avenue on November 27, 2019, following the home invasion, and that the investigation soon focused on Elijah Barrett as a suspect, and then also on Josia Bush and Ethan Grim, after law enforcement learned that Barrett had turned up at the Urbana hospital with a gunshot wound.

{¶128} Salyer testified that Bush and Grim were located together the following day at the residence of one of Grim's relatives, and that Salyer and another detective then interviewed Bush. In that recorded interview, which was played for the jury at trial, Bush first denied being in Bellefontaine on November 27th, but then acknowledged that he had gone to Bellefontaine on that date to hang out with Barrett and Grim at a place called Heritage. Bush noted that Grim was his cousin. Bush

said his cell phone had been lost while he was in Bellefontaine, or perhaps someone had stolen it from him. Bush also initially told the detectives that Grim's mother had picked them up in Bellefontaine that evening, and that they then went to a relative's house.

{¶129} In the recorded interview, after the detectives confronted Bush with some of the evidence that had been uncovered by the investigation at that point, urged him to tell the truth, and bluffed that the other suspects had said that Bush had the gun, Bush admitted that he was involved but said he played the smallest part. Bush said that there was just one gun involved, which he did not have. Bush added that there was a "dude" on the floor and that they had taken his gun. When questioned about whether he almost got shot by the man who ended up on the floor, Bush stated he was behind Grim at the time. Bush then repeatedly said that he did not shoot the guy on the floor, who had a pink gun. Bush admitted that he had the pink gun in the car afterwards, but insisted that he was not armed with a gun when he walked into the house. When asked about the color of the gun that had been taken into the house, Bush said it was orange.

{¶130} Bush told the police that when they came down the stairs after the shooting started, another guy in the house had what Bush thought was a machete, and that the guy with the machete was hitting Grim in the back with it, so Grim shot that guy. Bush said that happened as they were trying to get out of the house. Bush

stated that he burned everything he had been wearing. Bush said that he did not know the guy who had been driving the car, that it was someone who Grim knew.

{¶131} Finally, in addition to Elijah Barrett's testimony about Bush's participation in the home invasion and Bush's recorded admissions to the same, the state presented a variety of additional evidence at trial that corroborated Bush's involvement and the credibility of Barrett's testimony about, and Bush's confession to, the crimes. That evidence included video footage from a security surveillance camera at the Heritage Court Apartments showing Bush, Barrett, and Grim together in the hallway at shortly before 11:00 p.m. on the night in question; testimony from Mason Fox that Barrett and his two friends shown in the surveillance video were at Fox's apartment that evening along with Austin Allen, discussing "hitting a lick" before they left the apartment in Fox's car that he loaned to Allen; a post on Bush's Facebook account from earlier that same date in which he indicated he needed money; evidence that Bush's phone was found in a trash can at Nationwide Children's Hospital in Columbus, where Barrett was admitted for treatment after being shot; a photograph of fresh-looking wounds to Ethan Grim's back, taken at the time of his arrest the next day, with those wounds appearing consistent with being hit by a baton of the type found at the scene near Caleb Chamberlin's body; and testimony from Shelby Sherwood, a nurse employed by the Logan County Sheriff's Office, that on November 29, 2019, Bush was brought to the Logan County Juvenile Detention Center, that Sherwood evaluated Bush prior to admission at JDC,

that Bush's right forearm appeared and felt smooth at that time, that she asked Bush if he had shaved his arms, and that Bush said yes, he had shaved "the residue off." (Tr., 539).

{¶132} Upon review, we find that the evidence presented at trial overwhelmingly supports a finding of guilt even without Allen's out-of-court statements. We further note that the state did not reference Allen's statements in its closing argument, and therefore did not argue that the statements were substantive evidence of Bush's guilt. Because the remaining evidence of Bush's guilt was so tremendous, and because the brief testimony about Allen's out-of-court statements contained information that was merely cumulative to Bush's admissions and Elijah Barrett's testimony, we find no reasonable possibility that the evidence complained of contributed to the convictions. Accordingly, we hold that any error in the admission of Allen's statements was harmless beyond a reasonable doubt.

{¶133} The fourth assignment error is overruled.

*Fifth Assignment of Error*

{¶134} In the fifth assignment of error, Bush asserts that "[t]he jury's verdict is both against the manifest weight of the evidence and sufficiency of the evidence, resulting in verdicts that are inconsistent."

{¶135} Specifically, Bush argues that the jury's verdict of guilty on the felonious assault charge in Count 5, relating to victim Kiley Titus, was inconsistent with the not guilty verdict on the felonious assault charge in Count 4, which related

to victim Jamie Crum. Bush argues that "[i]t is clear that the jury lost its way" because those "conflicting" verdicts were "based on essentially the same fact pattern." Bush further argues that "[t]here was no testimony that Josia Bush was in possession of a deadly weapon when either of the women were attacked" and therefore "the jury's verdict of guilty as the charge relates to Miss Crum [*sic*] is against the manifest weight of the evidence and sufficiency of the evidence and must be reversed." Finally, Bush argues that a photograph showing Bush wearing glasses on a different occasion is exculpatory evidence that outweighs the other evidence relating to identification, as none of the eyewitnesses testified that any of the perpetrators wore glasses.

{¶136} Manifest weight of the evidence and sufficiency of the evidence are clearly different legal concepts. *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997).

{¶137} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St. 3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. Consequently, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* "In deciding if the evidence was

sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton Nos. C-120570 and C-120571, 2013-Ohio-4775, ¶ 33.

**{¶138}** By contrast, when reviewing whether a verdict was against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and examines the conflicting testimony. *State v. Thompkins*, *supra*, at 387. In doing so, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.* Nevertheless, when assessing a manifest-weight challenge, a reviewing court must allow the trier-of-fact appropriate discretion on matters relating to the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231, 227 N.E.2d 212 (1967). When applying the manifest-weight standard, "[o]nly in exceptional cases, where the evidence 'weighs heavily against the conviction,' should an appellate court overturn the trial court's judgment." *State v. Haller*, 3d Dist. Allen No. 1-11-34, 2012-Ohio-5233, ¶ 9, quoting *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, ¶ 119.

**{¶139}** As to Bush's claim regarding inconsistent verdicts, this Court recently addressed a similar issue in *State v. Cochran*, 3d Dist. Marion No. 9-21-19, 2022-Ohio-885. As we noted in that case:

"[I]nconsistent verdicts on different counts of a multi-count indictment do not justify overturning a verdict * * *." *State v. Hicks*, 43 Ohio St.3d 72, 78, 538 N.E.2d 1030 (1989). "'The several counts of an indictment containing more than one count are not interdependent and an inconsistency in a verdict does not arise out of inconsistent responses to different counts, but only arises out of inconsistent responses to the same count.'" *State v. Ford*, 158 Ohio St.3d 139, 2019-Ohio-4539, ¶ 347, 140 N.E.3d 616, quoting *State v. Adams*, 53 Ohio St.2d 223, 374 N.E.2d 137 (1978), paragraph two of the syllabus. "[J]uries can reach inconsistent verdicts for any number of reasons, including mistake, compromise, and leniency." *State v. Taylor*, 8th Dist. Cuyahoga No. 89629, 2008-Ohio-1626, ¶ 10. Thus, as we have recently held, inconsistencies in the jury's verdicts "do[ ] not suggest that [the guilty] verdicts are against the manifest weight of the evidence and do[ ] not provide a basis for the reversal of [the] convictions." *State v. Cobb*, 3d Dist. Allen No. 1-20-43, 2021-Ohio-3877, ¶ 87; *see State v. Bell*, 3d Dist. Marion No. 9-18-40, 2020-Ohio-4510, ¶ 58 (concluding that the fact that guilty verdicts for rape and kidnapping might be inconsistent with the not guilty verdicts for two additional counts of rape does not mean the defendant's convictions for rape and kidnapping are against the manifest weight of the evidence). * * *

*Cochran*, at ¶ 10. Consequently, there is no merit to Bush's argument here that his felonious assault conviction is against the manifest weight of the evidence simply because he was acquitted on a felonious assault charge relating to a different victim.

{¶140} Bush's assertion that there was no evidence that he was in possession of a deadly weapon when Kiley Titus was attacked also lacks merit, as Bush was charged in Count 5, as in all counts, with complicity to the offense at issue.

{¶141} Specifically, Bush was charged in Count 5 with Complicity to Felonious Assault in violation of R.C. 2903.11(A)(2) and R.C. 2923.03. R.C. 2901.11(A)(2) provides in relevant part that "[n]o person shall knowingly * * *

[c]ause or attempt to cause physical harm to another * * * by means of a deadly weapon" and R.C. 2923.03 provides in relevant part that, "[n]o person, acting with the kind of culpability required for the commission of an offense, shall * * * [a]id or abet another in committing the offense."

{¶142} Our review of the record reveals that there was more than sufficient evidence, and no evidence introduced to the contrary, that Kiley Titus was assaulted by being struck in the head with a loaded, operable firearm by one of the persons in the group of three perpetrators and that Bush was one of those perpetrators. Viewing that evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of felonious assault in violation of R.C. 2903.11(A)(2) proven beyond a reasonable doubt. Further, from the record before us, there is no indication that the jury clearly lost its way and created such a manifest miscarriage of justice that the felonious assault conviction on Count 5 must be reversed.

{¶143} For all the reasons stated, Bush's conviction on Count 5 was not against the manifest weight of the evidence and was supported by sufficient evidence.

{¶144} Last, we turn to Bush's argument that evidence showing him in glasses at a time separate from that of the commission of the offenses somehow established that he was not involved in the offenses. With regard to the manifest weight and sufficiency of the evidence as to the guilty verdicts on all counts of the

indictment, our thorough review of the record establishes that such a claim is also without merit.

{¶145} The fifth assignment of error is overruled.

*Sixth Assignment of Error*

{¶146} In the sixth assignment of error, Bush argues that the trial court erred in failing to reference co-defendant Austin Allen in a jury instruction relating to the evaluation of accomplice testimony.

{¶147} "[T]he trial judge is in the best position to gauge the evidence before the jury and is provided the discretion to determine whether the evidence adduced at trial was sufficient to require an instruction." *State v. Fulmer*, 117 Ohio St.3d 319, 2008-Ohio-936, ¶ 72. Thus, we generally review alleged errors in jury instructions for an abuse of discretion. *State v. Blanton*, 3d Dist. Marion No. 9-15-07, 2015-Ohio-4620, ¶ 55, citing *State v. Guster*, 66 Ohio St.2d 266, 271, 421 N.E.2d 157 (1981).

{¶148} Specifically relating to jury instructions on the issue of accomplice testimony, R.C. 2923.03(D) provides:

> If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:
>
> "The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility

-62-

and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth."

**{¶149}** Thus, R.C. 2923.03(D) requires a trial court to give a jury instruction relating to accomplice credibility, and the jury's evaluation thereof, in any case where an accomplice has testified against the defendant.

**{¶150}** In the instant case, the record reflects that the trial court gave such an instruction to the jury with regard to the testimony of Elijah Barrett. On appeal, Bush argues that his accomplice Austin Allen should have also been referenced in that instruction.

**{¶151}** However, as R.C. 2923.03(D) requires only that the instruction be given as to the *testimony* of any alleged accomplice who has appeared as a witness at trial, and because Austin Allen did not testify at the trial in this matter, we find Bush's argument to be without merit.

**{¶152}** In the sixth assignment of error, Bush also makes a more general argument in which he assigns error with the trial court failing to refer in the jury instructions to Austin Allen as a co-defendant or accomplice. In making this argument, Bush fails to identify what additional instruction, or instructions, or portion(s) thereof, with which he takes issue and in which he claims Austin Allen should have been referenced. To the extent this claim relates to the jury instructions

on complicity that were given by the trial court, we note that the jury was told that "[t]he State of Ohio's presented a theory that the defendant acted in complicity with Elijah Barrett and Ethan Grim in the commission of [the crimes at issue]" (Tr., 772), before then instructing specifically on complicity as to each crime charged. We find no prejudicial error in the lack of reference to Austin Allen in those instructions, particularly as the evidence of Austin Allen's involvement reflected that he was another aider and abettor who drove Bush, Barrett, and Grim to the Columbus Avenue residence and then waited outside, and the instruction was focused on the perpetrators who entered the home. Moreover, in order to convict a defendant as an accomplice, the prosecution need not prove who the principal offender was but only that there was a principal offender. *State v. Lamarr*, 3d Dist. Logan No. 8-04-39, 2005-Ohio-6030, ¶ 8, citing *State v. Perryman*, 49 Ohio St.2d 14, 358 N.E.2d 1040 (1976).

**{¶153}** For all the reasons stated, Bush's arguments regarding the issue of jury instructions lack merit.

**{¶154}** The sixth assignment of error is overruled.

*Seventh Assignment of Error*

**{¶155}** In the seventh assignment of error, Bush asserts that the trial court erred in overruling a defense motion for a change of venue.

**{¶156}** On October 5, 2022, nearly three weeks before the start of the jury trial in this case, Bush filed a motion seeking a change of venue on the basis that

pretrial publicity stemming from news articles and social media may have impacted his right to a fair and impartial jury. Attached to the motion was what appears to be the printed results of a Google search, displaying links to approximately ten news articles relating to this case and/or the cases of Bush's co-defendants.

{¶157} On that same date, the trial court filed a judgment entry denying the motion for change of venue "without prejudice to Defendant renewing the objection in the event voir dire demonstrates that a fair and impartial jury cannot be seated due to any pre-trial publicity * * *." (Judgment Entry Denying Motion for Change of Venue, Docket No. 126).

{¶158} A trial court's ruling on a motion for change of venue will not be disturbed on appeal absent an abuse of discretion. *State v. Roberts,* 110 Ohio St.3d 71, 2006–Ohio–3665, ¶ 116.

{¶159} Crim.R. 18(B) provides "[u]pon the motion of any party or upon its own motion the court may transfer an action to any court having jurisdiction of the subject matter outside the county in which trial would otherwise be held, when it appears that a fair and impartial trial cannot be held in the court in which the action is pending." See, also, R.C. 2901.12(K).

{¶160} A change of venue should not automatically be granted when extensive pretrial publicity exists. *State v. Frazier,* 115 Ohio St.3d 139, 2007-Ohio-5048, ¶ 235. "Pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial." *Roberts, supra*, at ¶ 117, citing *Nebraska Press*

*Assn. v. Stuart*, 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683 (1976). Instead, a "'defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased.'" *Frazier,* at ¶ 235, quoting *State v. Gross,* 97 Ohio St.3d 121, 2002-Ohio-5524, ¶ 29. "Only in rare cases may prejudice be presumed." *Roberts,* at ¶ 117, citing *State v. Treesh*, 90 Ohio St.3d 460, 464, 739 N.E.2d 749 (2001).

{¶161} The Supreme Court of Ohio has long held "that a careful and searching voir dire examination provides the best test of whether prejudicial pretrial publicity prevents the seating of a fair and impartial jury from the community." *Roberts,* at ¶ 116, citing *State v. Lynch,* 98 Ohio St.3d 514, 2003-Ohio-2284, ¶ 35, *State v. Landrum*, 53 Ohio St.3d 107, 117, 559 N.E.2d 710 (1990), and *State v. Swiger*, 5 Ohio St.2d 151, 214 N.E.2d 417 (1966), paragraph one of the syllabus.

{¶162} In this case, immediately prior to the start of the trial, the trial court held an on-the-record conference with counsel in chambers. At that time, the trial court noted that, "[o]nce we get to jury selection, we will – the Court will have questions for the jurors. I will ask the jurors about anything they've read or seen online in terms of pretrial publicity given the defendant's motion for change of venue and the Court's denial of that." (Tr., 12-13).

{¶163} Once the venire was seated in the courtroom and voir dire had begun, the trial court addressed the issue of pretrial publicity with the prospective jurors, as follows:

This is a case that has received some attention from the media. Because these events received some publicity, you may have heard or read something about the events that give rise to this case.

So my question to all of you is have you gained prior knowledge of these events from the Internet, social media, the newspaper, radio or television? If you've gained any knowledge of the events in this case from any media, would you please raise your hand. Let the record reflect that no prospective juror has raised his or her hand.

(Tr., 47).

{¶164} Once voir dire was turned over to counsel for the state, one prospective juror, Juror No. 483, indicated in passing that she remembered the incident at issue having happened. When Juror No. 483 was subsequently questioned by defense counsel as to what she knew about the incident, the prospective juror replied, "Just what I had read in the newspaper." (Tr., 92). Juror No. 483 was not ultimately seated on the jury, and no other prospective juror indicated by their voir dire responses that they had any material knowledge of the case from media or other sources.

{¶165} The trial transcript reflects that the defense motion for change of venue was not renewed during the jury selection process, or at any time thereafter.

{¶166} On appeal, Bush argues generally that the trial court erred in overruling the motion for change of venue, and he also argues that one particular juror, Juror No. 428, should have been the basis for a change of venue.

{¶167} Our review of the record of the voir dire, including but not limited to the information relevant to Juror No. 428, reflects no valid basis for a change of venue. In the absence of any indication that members of the venire had been exposed to pretrial publicity or had some personal knowledge of the case and, as a result of that, were unable to remain fair and impartial, Bush has failed to establish that the trial court erred in failing to grant a change of venue.

{¶168} The seventh assignment of error is overruled.

*Eighth Assignment of Error*

{¶169} In the eighth assignment of error, Bush asserts that he was deprived of a jury of his peers.

{¶170} In this regard, the record reflects that during voir dire, immediately after the prosecution had finished questioning the panel, defense counsel asked to approach the bench. A brief bench conference was then held, during which Bush's counsel requested a break and then stated:

> The second thing I just wanted to put on the record viewing the entire jury panel, potential jurors, there are no minorities. I do – I don't [*sic*] think I see a couple Asian Americans, but my client is a mixed race, African American/white individual, and I just wanted to put on the record that there are no minorities of his race in the jury pool.

(Tr., 84).

> In response to that, the trial court stated:

> The Court will say for the record that the jurors have been both called and seated randomly. There's been no offer implied of any kind of discrimination how this jury panel pool came to be here in the

-68-

courthouse today, and Court respects defense counsel's right to make a record of the ethnicity and background of race of the potential jury pool, and I think that's all that needs to be said about this right now. And we will take a break.

(Tr., 84-85).

{¶171} Subsequently, just after the jury had been empaneled, the trial court asked counsel, outside the presence of the jury, if there was anything further to take up regarding jury selection. At that time, the following exchange occurred:

MR. NOWICKI [DEFENSE COUNSEL]: I wanted to bring up now that we have a jury seated, that I think from my recollection there are no minorities now seated in the jury or as alternates. And as previously noted, there were no minorities similar to my client's that were in the jury pool. But I think I'd have to prove some kind of discriminatory intent.

Since there were no minorities in the jury pool, I can't make a case in removing jurors, but I think the exclusion of jurors – any minorities similar to my client's just – it just seems to have – just resonates with me that the method in which the jurors are selected could potentially have a discriminatory –

THE COURT: Are you saying that's inherent and prejudicial?

MR. NOWICKI: Yes.

THE COURT: That's what I thought you were saying. The Court disagrees. The jurors have been randomly selected, randomly seated. They've been drawn from the jury pool in Logan County as every other single juror in Logan County is drawn. There has been no consideration given to selecting this jury to race, creed, color, ethnicity, national origin, or any other improper or insidious discriminatory intent, but I note your point for the record, Mr. Nowicki.

MR. NOWICKI: Thank you.

THE COURT: Anything further?

MR. NOWICKI: No, your honor.

(Tr., 131-132).

{¶172} On appeal, Bush asserts that he was deprived of a jury of his peers in that there were no minorities or, Bush now also claims, adults closer to his age in the jury pool.

{¶173} The Sixth Amendment guarantee to a jury trial contemplates a jury drawn from a fair cross section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 527-529, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). To establish a violation of this requirement, the "defendant must prove: (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that the representation is due to systematic exclusion of the group in the jury-selection process." *State v. Fulton*, 57 Ohio St.3d 120, 566 N.E.2d 1195 (1991), paragraph two of the syllabus, citing *Duren v. Missouri*, 439 U.S. 357, 364, 99 S.Ct. 664, 668, 58 L.Ed.2d 579, 586–587 (1979).

{¶174} In this case, other than defense counsel's personal observation that the venire appeared imbalanced, Bush failed to produce any evidence demonstrating that African–Americans or mixed-race persons were underrepresented on the venire in relation to their percentage in the community. There is no evidence in the record

whatsoever as to the age of the persons in the venire or on the master list of potential jurors, and neither "young adults" nor "college students" are a "distinct group" cognizable for purposes of the fair cross section requirement. *State v. Seymour*, 5th Dist. Richland No. 03-CA-37, 2004-Ohio-3835, ¶ 54, citing *United States v. Maxwell*, 160 F.3d 1071, 1075-76 (6th Cir.1998); *United States v. Fletcher*, 965 F.2d 781, 782 (9th Cir.1992); *Ford v. Seabold*, 841 F.2d 677, 681-82 (6th Cir.1988), cert. denied, 488 U.S. 928, 109 S.Ct. 315, 102 L.Ed.2d 334 (1988).

{¶175} More importantly, the defense also did not produce any evidence of the systematic exclusion of African–Americans or mixed-race persons from the process used to draw jurors in Logan County. Finally, we note that Bush's claim is based solely on alleged underrepresentation on *his* venire; however, under-representation on a single venire is not *systematic* exclusion. *State v. McNeill*, 83 Ohio St.3d 438, 444, 700 N.E.2d 596 (1998).

{¶176} For all of these reasons, Bush's claims regarding the makeup of the venire on the basis of race or age lack merit. The eighth assignment of error is overruled.

*Ninth Assignment of Error*

{¶177} In the ninth assignment of error, Bush argues that he was deprived of the effective assistance of trial counsel. Bush asserts that a number of errors on counsel's part served to cumulatively amount to ineffective assistance of counsel, specifically pointing to the following claimed errors: (1) failure to renew the change

of venue motion and failure to object to Juror No. 428 remaining on the panel; (2) failure to emphasize the evidence that Bush wears glasses and that none of the eyewitnesses identified one of the intruders as wearing glasses; (3) failure to object to the admission of a Facebook post and text message on the basis of lack of foundation; (4) failure to object when Detective Salyer and Elijah Barrett testified as to statements made by Austin Allen; (5) failure to object to the admission of a video showing Ethan Grim in a police cruiser with Bush; (6) failure to object to the admission of State's Exhibits 127-130, which were printouts of a text message and photos relating to the orange gun; and (7) failure to object to the lack of reference to Austin Allen in the jury instruction on accomplice testimony and the lack of reference to Austin Allen in the jury instructions on complicity.

{¶178} "[I]n Ohio, a properly licensed attorney is presumed competent." *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, ¶ 62. To prove ineffective assistance of counsel, a defendant must establish that: (1) counsel's performance was deficient, and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsel's performance is deficient if it falls below an objective standard of reasonable representation. *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Prejudice exists if there is "a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different." *State v. Sowell*, 148 Ohio St.3d 554, 2016-Ohio-8025, ¶ 138.

**{¶179}** "Under [the] doctrine of cumulative error, a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of a fair trial even though each of the numerous instances of trial court error does not individually constitute cause for reversal." *State v. Spencer*, 3d Dist. Marion No. 9-13-50, 2015-Ohio-52, ¶ 83, citing *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, ¶ 222-224; *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). "'To find cumulative error, a court must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors.'" *State v. Stober*, 3d Dist. Putnam No. 12-13-13, 2014-Ohio-5629, ¶ 15, quoting *In re J.M.*, 3d Dist. Putnam No. 12-11-06, 2012-Ohio-1467, ¶ 36.

**{¶180}** "'The Ohio Supreme Court previously recognized that the doctrine of cumulative error may be applied to a claim of ineffective assistance of counsel.'" *State v. Bruce*, 3d Dist. Union No. 14-22-11, 2023-Ohio 3298, ¶ 111, quoting *State v. Hopings*, 6th Dist. Lucas No. L-20-1075, 2022-Ohio-1532, ¶ 44. However, "'[e]ach assertion of ineffective assistance of counsel going to cumulative error depends on the merits of each individual claim; when none of the individual claims of ineffective assistance of counsel have merit, cumulative error cannot be established simply by joining those meritless claims together.'" *State v. Gear*, 3d Dist. Van Wert No. 15-22-03, 2023-Ohio-1246, ¶ 59, quoting *State v. Graham*, 164 Ohio St.3d 187, 2020-Ohio-6700, ¶ 170.

{¶181} In the instant case, the first, second, fourth, and seventh bases of Bush's ineffective assistance of counsel claim relate to arguments previously raised in other assignments of error. After considering the merits of those claims, *supra*, we concluded that Bush did not demonstrate error as to those issues or, in the sole instance where error was found, that the same was not prejudicial.

{¶182} As to the third, fifth, and sixth bases of claimed ineffectiveness of counsel, Bush presents no analysis and cites to no legal authority in support of those claims of error.

{¶183} Pursuant to App.R. 12(A)(2), "[t]he court may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief, as required under App.R. 16(A)."

{¶184} App.R. 16(A)(7) provides that "[t]he appellant *shall* include in its brief * * * [a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and the *reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies.*" (Emphasis added.)

{¶185} A defendant has the burden of affirmatively demonstrating error on appeal and, if an argument exists that can support an assignment of error, it is not this Court's duty to root it out. *State v. Moore*, 3d Dist. Henry No. 7-19-01, 2019-Ohio-2633, ¶ 10.

**{¶186}** As we are not required to address arguments that have not been sufficiently presented for review or supported by proper authority under App.R. 16(A)(7), we decline to address Bush's third, fifth, and sixth claims of ineffective counsel pursuant to App.R. 12(A)(2). *See Black v. St. Marys Police Dept.*, 3d Dist. Mercer No. 10-11-11, 2011-Ohio-6697, ¶ 14. *See also Meerhoff v. Huntington Mtge. Co.*, 103 Ohio App.3d 164, 169 (3d Dist.1995).

**{¶187}** The ninth assignment of error is overruled.

*Tenth Assignment of Error*

**{¶188}** In the tenth assignment of error, Bush asserts that his sentence is contrary to law.

**{¶189}** "Under R.C. 2953.08(G)(2), an appellate court will reverse a sentence 'only if it determines by clear and convincing evidence that the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law.'" *State v. Nienberg*, 3d Dist. Putnam Nos. 12-16-15 and 12-16-16, 2017-Ohio-2920, ¶ 8, quoting *State v. Marcum*, 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1. "Clear and convincing evidence is that '"which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established."'" *Id.*, quoting *Marcum* at ¶ 22, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

**{¶190}** Here, Bush argues that his sentence is contrary to law for several reasons. However, we need not address the specifics of those claims as we find that

the sentence must be reversed due to the trial court's failure to apply R.C. 2929.19(B)(1)(b) when imposing sentence.

**{¶191}** As the State of Ohio accurately notes in its merit brief, R.C. 2929.19(B)(1) was amended in 2021, and now reads as follows:

(B)(1) At the sentencing hearing, the court, before imposing sentence, shall do all of the following:

(a) Consider the record, any information presented at the hearing by any person pursuant to division (A) of this section, and, if one was prepared, the presentence investigation report made pursuant to section 2951.03 of the Revised Code or Criminal Rule 32.2, and any victim impact statement made pursuant to section 2947.051 of the Revised Code;

(b) If the offense was committed when the offender was under eighteen years of age, in addition to other factors considered, consider youth and its characteristics as mitigating factors, including:

(i) The chronological age of the offender at the time of the offense and that age's hallmark features, including intellectual capacity, immaturity, impetuosity, and a failure to appreciate risks and consequences;

(ii) The family and home environment of the offender at the time of the offense, the offender's inability to control the offender's surroundings, a history of trauma regarding the offender, and the offender's school and special education history;

(iii) The circumstances of the offense, including the extent of the offender's participation in the conduct and the way familial and peer pressures may have impacted the offender's conduct;

(iv) Whether the offender might have been charged and convicted of a lesser offense if not for the incompetencies associated with youth, such as the offender's inability to deal with police officers and prosecutors during the offender's interrogation or possible plea

agreement or the offenders inability to assist the offender's own attorney;

(v) Examples of the offender's rehabilitation, including any subsequent growth or increase in maturity during confinement.

**{¶192}** In *State v. Spears*, 5th Dist. Fairfield No. 2021 CA 00030, 2023-Ohio-187, the Fifth District Court of Appeals addressed the issue of what appropriate consideration of R.C. 2929.19(B)(1)(b) entails. Due to the lack of precedent on that issue, the Fifth District likened the analysis to that of the sentencing considerations contained in R.C. 2929.11 and 2929.12, which require only that the trial court consider both R.C. 2929.11 and 2929.12 before imposing a prison sentence, and with no requirement to make specific findings under any of those considerations. *Spears* at ¶ 36-40, citing *State v. Wilson*, 129 Ohio St.3d 214, 2011-Ohio-2669, ¶ 31; *State v. Arnett*, 88 Ohio St.3d 208, 724 N.E.2d 793 (2000). However, the court in *Spears* went on to note:

> While precedent does not require the trial court to produce findings, our holdings with regard to R.C. 2929.11 and R.C. 2929.12 require that the "necessary findings can be found in the record," *State v. Taylor*, 5th Dist. Richland No. 17CA29, 2017-Ohio-8996, 2017 WL 6371306, ¶ 27, *State v. Webb*, 5th Dist. Muskingum No. CT2018-0069, 2019-Ohio-4195, 2019 WL 5092631, ¶ 19 or that "the record reflect[ ] that the trial court considered the purposes and principles of sentencing and the seriousness and recidivism factors as required in Sections 2929.11 and 2929.12 of the Ohio Revised Code." *State v. Hayes*, 5th Dist. Knox No. 18CA10, 2019-Ohio-1629, 2019 WL 1938718, ¶ 55. See *State v. Green*, 7th Dist., 2021-Ohio-2412, 173 N.E.3d 876, ¶ 63 and *State v. Hughes*, 6th Dist. Wood No. WD-05-024, 2005-Ohio-6405, 2005 WL 3254572, ¶ 10. The mandate of R.C. 2929.19, that the trial court consider specific factors, is sufficiently similar to the language of R.C. 2929.11 and R.C. 2929.12 to warrant

to [*sic*] the same analysis. Consequently, while the trial court need not specify findings regarding the factors listed in R.C. 2929.19(B)(1)(b), we must review the record to determine whether it affirmatively shows the court failed to consider those factors.

*Spears* at ¶ 40.

**{¶193}** We find the analysis of the Fifth District persuasive, and therefore have applied that standard in our review of the sentencing record in this case. In so doing, we find no indication that the trial court adequately complied with its obligation to carefully consider Bush's "youth and its characteristics as mitigating factors" before imposing sentence. On the contrary, we note that the trial court seemingly found Bush's breach of his plea agreement to be an aggravating factor in sentencing, whereas under R.C. 2929.19(B)(1)(b)(iv) such a situation may potentially be considered as a factor in mitigation of sentence. Additionally, the sentencing hearing transcript and the judgment entry of sentencing affirmatively reflect the trial court's consideration of the sentencing guidelines set forth in R.C. 2929.11 and 2929.12; however, there is no reference by the trial court to its consideration of R.C. 2929.19(B)(1)(b).

**{¶194}** For those reasons, we find that the record affirmatively shows that the trial court did not consider the factors listed under R.C. 2929.19(B)(1)(b), which renders Bush's sentence clearly and convincingly contrary to law.

**{¶195}** The tenth assignment of error is sustained.

*Eleventh Assignment of Error*

**{¶196}** In the eleventh assignment of error, Bush argues that this Court erred in overruling a motion to supplement the record on appeal.

**{¶197}** With regard to this issue, the record reflects that the notice of appeal in this case was filed on November 15, 2022, and the record was filed in the appeal on February 6, 2023.

**{¶198}** On April 13, 2023, Bush's appellate counsel filed a motion with this Court, seeking leave to supplement the appellate record with certified copies of the sentencing entries in the trial court cases of Bush's co-defendants, being *State v. Barrett*, *State v. Grim*, and *State v. Allen*. The motion to supplement the record asserted that "these entries are a necessary part of the record for at least one identified assignment of error."

**{¶199}** On April 17, 2023, this Court filed a judgment entry overruling Bush's motion to supplement the record, noting that an appellate court may only consider on appeal those papers and exhibits that were properly filed and included in the record before the trial court. See App.R. 9(A). Additionally, citing to *State v. Ishmail*, 54 Ohio St.2d 402, 377 N.E.2d 500 (1978), this court's judgment entry noted that a record on appeal may be supplemented only to add matters that were actually before the trial court, and therefore constitute part of the original proceedings in the case.

**{¶200}** Bush now asserts in the eleventh assignment of error that this Court erred in not permitting Bush to supplement the record. This claim lacks merit, for the reasons stated in our April 17, 2023 judgment entry. More importantly, however, except as provided by law, this Court lacks jurisdiction to review its own orders on appeal. See Ohio Constitution, Article IV, Section 3. In this instance, there is no legal basis for this Court to review on appeal our prior decision on Bush's motion to supplement the record.

**{¶201}** The eleventh assignment of error is overruled.

*Twelfth Assignment of Error*

**{¶202}** In the twelfth assignment of error, Bush contends that the trial court erred in imposing an indefinite prison term pursuant to the Reagan Tokes Act, with Bush arguing that the Reagan Tokes Act is unconstitutional.[1]

**{¶203}** Bush did not challenge the constitutionality of the Reagan Tokes Law in the trial court, so we therefore apply the plain-error standard of review in this case. *State v. Ball*, 3d Dist. Allen No. 1-21-16, 2022-Ohio-1549, ¶ 57. "An error qualifies as 'plain error' only if it is obvious and but for the error, the outcome of the proceeding clearly would have been otherwise." *State v. Barnhart*, 3d Dist. Putnam No. 12-20-08, 2021-Ohio-2874, ¶ 8, citing *State v. Yarbrough*, 95 Ohio St.3d 227, 245, 2002-Ohio-2126, ¶ 32.

---

[1] This assignment of error was conceded and withdrawn by Bush at oral argument; however, because the claim was originally raised in Bush's merit brief, we have opted to include an analysis in this opinion.

{¶204} As this Court noted in *Ball*, *supra*, challenges to the Reagan Tokes Law do not present a matter of first impression in this Court. *Ball* at ¶ 59. "Since the indefinite sentencing provisions of the Reagan Tokes Law went into effect in March 2019, we have repeatedly been asked to address the constitutionality of these provisions. We have invariably concluded that the indefinite sentencing provisions of the Reagan Tokes Law do not facially violate the separation-of-powers doctrine or infringe on defendants' due process rights." *Id.* citing *e.g.*, *State v. Crawford*, 3d Dist. Henry No. 7-20-05, 2021-Ohio-547, ¶ 10-11; *State v. Hacker*, 3d Dist. Logan No. 8-20-01, 2020-Ohio-5048, ¶ 22; *State v. Wolfe*, 3d Dist. Union No. 14-21-16, 2022-Ohio-96, ¶ 21. We have also rejected constitutional challenges related to a defendant's right to trial by jury. *See Ball* at ¶ 61-63.

{¶205} Additionally, in *State v. Hacker*, ___ Ohio St.3d ___, 2023-Ohio-2535, the Supreme Court of Ohio recently reviewed the Reagan Tokes Law and held that indefinite sentencing pursuant to that law is constitutional.

{¶206} Thus, on the basis of *Hacker* and all the prior precedent of this Court, we find no merit to Bush's challenge to the Reagan Tokes Law.

{¶207} The twelfth assignment of error is overruled.

*Conclusion*

{¶208} For the foregoing reasons, the judgment of the Logan County Court of Common Pleas is affirmed in part and reversed in part, and the matter is remanded

to the trial court for resentencing consistent with our disposition of the tenth assignment of error.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded.*

**MILLER, P.J. and WILLAMOWSKI, J., concur.**

**/hls**