[Cite as *State v. Youngblood*, 2025-Ohio-2794.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

|  |  |
|---|---|
| STATE OF OHIO | : |
| | :    C.A. No. 2024-CA-72 |
|     Appellee | : |
| | :    Trial Court Case No. 24-CR-0461 |
| v. | : |
| | :    (Criminal Appeal from Common Pleas |
| KAMAREE YOUNGBLOOD | :    Court) |
| | : |
|     Appellant | :    **FINAL JUDGMENT ENTRY &** |
| | :    **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on August 8, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
CHRISTOPHER B. EPLEY, PRESIDING JUDGE

TUCKER, J., and HANSEMAN, J., concur.

**OPINION**
CLARK C.A. No. 2024-CA-72


CHARLYN BOHLAND & NATHAN MAYNARD, Attorneys for Appellant
ROBERT C. LOGSDON, Attorney for Appellee


EPLEY, P.J.

{¶ 1} After being bound over from juvenile court, Ka'Maree Youngblood pled guilty in the Clark County Court of Common Pleas to one count of discharge of a firearm on or near prohibited premises, a first-degree felony, with a firearm specification. The trial court sentenced him to the maximum term of a minimum of 11 years to a maximum of 16.5 years in prison, plus an additional three years for the firearm specification.

{¶ 2} Youngblood appeals from his conviction, claiming that the trial court erred in failing to consider his youth at sentencing, as required by R.C. 2929.19(B)(1)(b). For the following reasons, the trial court's judgment is affirmed.

### I. Facts and Procedural History

{¶ 3} In February 2024, Youngblood, who was then 17 years and five months old, was involved in a series of incidents in Springfield. At approximately 1:30 a.m. on February 3, 2024, an individual in a small white car fired multiple gunshots at a home on Hubert Avenue in a drive-by shooting. The resident, who was just arriving home from work, hid behind his car and returned fire with his .40 caliber Smith and Wesson. During the shoot-out, one of the bullets hit the car parked in front of the home next door. A camera at the neighbor's home captured the shooting, but no person could be identified. A spent .380 caliber shell casing was found by the police near the neighbor's car. They also collected numerous .40 caliber casings fired from the resident's gun.

{¶ 4} The Hubert Avenue resident indicated that his home had been fired upon several times previously, including the previous day. The resident's daughter told police that she had seen Youngblood driving past her home a few minutes before the February 2 shooting. She had also heard that, after the February 3 shooting, Youngblood did a live chat on social media, saying that he had "just got busy over on South Hubert Avenue."

{¶ 5} Within a few days, the Springfield police recovered a stolen white Kia Rio, which Detective Ronald Jordan believed may have been involved in the Hubert Avenue shootings. Two .380 caliber shell casings were located on the passenger floorboard of the vehicle. The casings were entered into the National Integrated Ballistic Information Network (NIBIN), which compares known test-fired firearms with cartridge cases from crime scenes. The casings from the car matched the casing found near the neighbor's vehicle.

{¶ 6} Around 8:00 p.m. on February 9, 2024, shots were fired at a home on Highland Avenue while two teenaged cousins were on the porch. The 14-year-old boy was shot in the hip. The 17-year-old pushed his younger cousin inside, and they hid behind a living room couch. The police later found four .380 caliber shell casings on the sidewalk across from the residence, and spent bullets were recovered from the home. The casings were entered into NIBIN; they matched casings from the February 3 shooting.

{¶ 7} During the afternoon of February 20, 2024, Youngblood was one of four people in a black Kia Soul that was under police surveillance. When an officer attempted a traffic stop, the vehicle fled. Officers later located the vehicle, empty, and saw three men and one woman walking away. When the three men came to an area with a high police presence, they fled on foot in different directions. Youngblood was carrying a firearm as he ran. When he was apprehended, he placed his loaded Smith & Wesson 380 M&P Shield EZ semi-automatic handgun under a nearby vehicle, as instructed by law enforcement officers.

After the police test-fired the weapon, the gun was tied to the February 3 and February 9 shootings. In an interview with a detective on February 20, Youngblood said that he had possessed the gun for approximately a month.

{¶ 8} Youngblood was charged in three juvenile cases related to these incidents. In Clark J.C. No. 2024-0181, arising from the February 3 shooting, Youngblood was alleged to be a delinquent juvenile based on his committing discharge of a firearm on or near prohibited premises, carrying a concealed weapon, improper handling of a firearm in a motor vehicle, and criminal damaging. In Clark J.C. No. 2024-0172, concerning the February 9 shooting, the State alleged delinquency based on attempted murder, discharge of a firearm on or near prohibited premises, discharge of a firearm into a habitation, and felonious assault. The State dismissed the attempted murder charge at Youngblood's arraignment. Finally, in Clark J.C. No. 2024-0118, which arose from the February 20 incident, Youngblood was alleged to be a delinquent juvenile for having weapons while under disability, carrying a concealed weapon, receiving stolen property, and obstructing official business. Several of the charges carried firearm specifications.

{¶ 9} After the State requested that the juvenile court relinquish jurisdiction and transfer Youngblood to the general division of the common pleas court for prosecution as an adult, the juvenile court conducted probable cause and amenability hearings. The court granted the State's motion, and Youngblood was bound over for prosecution as an adult.

{¶ 10} In June 2024, Youngblood was indicted in three separate cases related to the events of February 3, February 9, and February 20, 2024. The indictments largely mirrored the juvenile charges, with a few differences. Youngblood was not charged with criminal damaging related to the February 3 shooting (*see* Clark C.P. No. 24 CR 0460) or having weapons while under disability related to the February 20 incident (*see* Clark C.P. No. 24

CR 0462), and the State included a second count of felonious assault concerning the February 9 shooting (*see* Clark C.P. No. 24 CR 0461).

{¶ 11} On September 11, 2024, Youngblood pled guilty in Case No. 24 CR 0461 (the February 9 shooting) to one count of discharge of a firearm on or near prohibited premises in violation of R.C. 2923.162(A)(3) and (C)(4), a first-degree felony, with a firearm specification. In exchange for the plea, the State dismissed the remaining charges and specifications in that case, as well as the indictments in Case Nos. 24 CR 0460 and 24 CR 0462. The parties agreed to a presentence investigation (PSI). Youngblood further agreed to forfeit the firearm. The trial court accepted Youngblood's guilty plea and ordered a PSI.

{¶ 12} The matter proceeded to sentencing on October 4, 2024. After hearing from defense counsel and the prosecutor and speaking briefly with Youngblood, the trial court imposed the maximum sentence of 11 to 16½ years in prison, plus three additional years for the firearm specification. The trial court did not mention R.C. 2929.19(B)(1)(b) either at sentencing or in its judgment entry.

{¶ 13} Youngblood appeals from the trial court's judgment, raising one assignment of error.

## II. Consideration of R.C. 2929.19(B)(1)(b)

{¶ 14} In his sole assignment of error, Youngblood claims that his prison sentence was "unauthorized by and contrary to law because the trial court plainly failed to comply with the mandatory sentencing provisions of R.C. 2929.19(B)(1)(b), which now requires trial courts to consider a child's youth and all of its attendant characteristics before sentencing them to adult prison."

{¶ 15} In reviewing felony sentences, appellate courts must apply the standard of

review set forth in R.C. 2953.08(G)(2). *State v. Marcum*, 2016-Ohio-1002, ¶ 9. Under that statute, an appellate court may increase, reduce, or modify a sentence, or it may vacate the sentence and remand for resentencing, only if it "clearly and convincingly" finds either (1) that the record does not support certain specified findings or (2) that the sentence imposed is contrary to law. *State v. Huffman*, 2017-Ohio-4097, ¶ 6 (2d Dist.).

{¶ 16} In sentencing, the trial court must consider the purposes and principles of sentencing in R.C. 2929.11 and the seriousness and recidivism factors in R.C. 2929.12. Pursuant to R.C. 2929.11(A), "the sentencing court shall consider the need for incapacitating the offender, deterring the offender and others from future crime, rehabilitating the offender, and making restitution to the victim of the offense, the public, or both." Similarly, R.C. 2929.12 contains a list of factors to be considered "regarding the offender, the offense, or the victim" to determine whether the offender's conduct is more serious or less serious than conduct normally constituting the offense and to establish whether the offender is more or less likely to commit crimes in the future. *State v. Bryant*, 2024-Ohio-1192, ¶ 32 (2d Dist.).

{¶ 17} R.C. 2929.11 and R.C. 2929.12 are not fact-finding statutes, and while the sentencing court must "consider" the factors, it is not required to make specific findings on the record regarding its consideration of the factors. *Id*. at ¶ 22. "On a silent record, a trial court is presumed to have considered the statutory purposes and principles of sentencing, and the statutory seriousness and recidivism factors." *State v. Goldblum*, 2014-Ohio-5068, ¶ 50.

{¶ 18} "The trial court has full discretion to impose any sentence within the authorized statutory range, and the court is not required to make any findings or give its reasons for imposing maximum or more than minimum sentences." *State v. King*, 2013-Ohio-2021, ¶ 45 (2d Dist.). With adult offenders, we have said that "[i]t is enough that the record

demonstrates that the trial court considered R.C. 2929.11 and R.C. 2929.12 prior to imposing its sentence." *State v. Trent*, 2021-Ohio-3698, ¶ 15 (2d Dist.). "A sentence is contrary to law when it does not fall within the statutory range for the offense or if the trial court fails to consider the purposes and principles of felony sentencing set forth in R.C. 2929.11 and the sentencing factors set forth in R.C. 2929.12." (Citation omitted.) *State v. Brown*, 2017-Ohio-8416, ¶ 74 (2d Dist.).

{¶ 19} In 2021, the legislature enacted R.C. 2929.19(B)(1)(b), which requires the trial court to consider additional mitigating factors when the offender was under 18 at the time the crime was committed. The statute states, in relevant part:

(b) if the offense was committed when the offender was under eighteen years of age, in addition to other factors considered, consider youth and its characteristics as mitigating factors, including:

(i) The chronological age of the offender at the time of the offense and that age's hallmark features, including intellectual capacity, immaturity, impetuosity, and a failure to appreciate risks and consequences;

(ii) The family and home environment of the offender at the time of the offense, the offender's inability to control the offender's surroundings, a history of trauma regarding the offender, and the offender's school and special education history;

(iii) The circumstances of the offense, including the extent of the offender's participation in the conduct and the way familial and peer pressures may have impacted the offender's conduct;

(iv) Whether the offender might have been charged and convicted of a lesser offense if not for the incompetencies associated with youth, such

as the offender's inability to deal with police officers and prosecutors during the offender's interrogation or possible plea agreement or the offender's inability to assist the offender's own attorney;

(v) Examples of the offender's rehabilitation, including any subsequent growth or increase in maturity during confinement.

R.C. 2929.19(B)(1)(b)(i)-(v).

{¶ 20} As with R.C. 2929.11 and R.C. 2929.12, there is no language in R.C. 2929.19(B)(1)(b) that requires a trial court to make express findings as to the youth-mitigation factors. Consequently, our review is limited to whether the record affirmatively demonstrates that the trial court failed to consider the R.C. 2929.19(B)(1)(b) factors. *Bryant*, 2024-Ohio-1192, at ¶ 37.

{¶ 21} Youngblood asserts that "it is clear the trial court did not consider, address, or apply any of the mitigating factors found in R.C. 2929.19(B)(1)(b) prior to sentencing." He emphasizes that the trial court never referenced the statute or any of the youth-mitigating factors. Moreover, he asserts that the imposition of a maximum sentence reflects that the trial court failed to consider those factors. Youngblood further contends that the information provided in the PSI failed to touch on many of the youth-mitigating factors. He likens his case to *State v. Bush*, 2023-Ohio-4473 (3d Dist.), and *State v. Spears*, 2023-Ohio-187 (5th Dist.), and argues that it is distinguishable from *Bryant*.

{¶ 22} The defendant in *Spears* received a sentence of 16 to 21 years in prison for aggravated robbery and involuntary manslaughter with a firearm specification. Although the trial court had mentioned some of the factors set forth in R.C. 2929.19(B)(1)(b) at sentencing, he claimed that the trial court did not consider the remaining factors. *Spears* at ¶ 34. Looking to R.C. 2929.11 and R.C. 2929.12 for guidance, the Fifth District held that

it "must review the record to determine whether it affirmatively shows the court failed to consider [the R.C. 2929.19(B)(1)(b)] factors." *Id*. at ¶ 40. Upon conducting its review, the appellate court emphasized that the PSI was incomplete. While the PSI in that case contained a comprehensive description of the facts leading to the charges and the police investigation, the reviewing court indicated that the PSI interview had not been completed, and there was no information about Spears's education, family history, employment history, counseling and substance abuse history, or health/medical history. On that record, the appellate court found that the record affirmatively showed that the trial court had not considered the factors listed in R.C. 2929.19(B)(1)(b) because the record lacked "any evidence that could be reasonably interpreted as related to those factors." *Id*. at ¶ 49.

{¶ 23} In *Bush*, the defendant, who was 16 years old when the offenses occurred, was involved in a home invasion that resulted in the death of two people. After Bush breached the terms of his plea agreement, the State successfully sought to revoke the agreement, and Bush was tried by a jury. He was found guilty of several charges, including two counts of murder. The court imposed an aggregate sentence of 75 years to life in prison. Employing the analytical framework of *Spears*, the Third District found no indication that the trial court had adequately complied with its obligation to carefully consider Bush's "youth and its characteristics as mitigating factors" before imposing sentence. It noted that the trial court had "seemingly found Bush's breach of his plea agreement to be an aggravating factor in sentencing, whereas under R.C. 2929.19(B)(1)(b)(iv) such a situation may potentially be considered as a factor in mitigation of sentence." *Bush* at ¶ 193. It further cited that the "sentencing hearing transcript and the judgment entry of sentencing affirmatively reflect the trial court's consideration of the sentencing guidelines set forth in R.C. 2929.11 and 2929.12; however, there is no reference by the trial court to its

consideration of R.C. 2929.19(B)(1)(b)." *Id*.

{¶ 24} In *Bryant*, we adopted the analytical framework in *Spears*, but concluded, based on the record before us, that there was no evidence that the trial court had failed to comply with its obligations under R.C. 2929.19(B)(1)(b). As in *Bush*, the trial court had expressly stated that it had considered the statutory considerations in R.C. 2929.11 and R.C. 2929.12 but made no similar statement regarding any of the mitigating factors in R.C. 2929.19(B)(1)(b). However, we emphasized that the record confirmed that there was evidence pertaining to the mitigating factors of R.C. 2929.19(B)(1)(b) before the court. We explained:

> For instance, the court stated that it had considered Bryant's PSI, which included his juvenile criminal history and dispositions (which showed that juvenile justice system interventions were not succeeding), his social and family history (which described his "chaotic" home life, his troubled relationship with his mother due to her constant drug use, physical abuse from his mother's boyfriend and possible sexual abuse at the hands of a cousin), his school record (he dropped out in high school), and a police report. In addition to considering the PSI, the sentencing court discussed on the record all of Bryant's juvenile offenses and particularly noted some acts of violence including multiple domestic violence charges and a 2021 first-degree misdemeanor assault that was amended down from felonious assault, a second-degree felony. It stated, "Mr. Bryant, this was a very troubling case to the court. Very troubling. And I think it's primarily by the fact of your – your young age, and the fact that you've had multiple – numerous interventions with regard to this type of behavior." Sentencing Tr. at 13. The court went

on to note that this crime was just the next step in a course of conduct that had lasted for years. "It's a matter of protection of the public, and that's my job. . . . This isn't just an immature decision on your [part], it's an intentional decision." *Id.* at 14-15. Bryant's counsel, likewise, spoke of his age, his "rough childhood" in which he moved constantly, suffered abuse, and never met his father. Defense counsel also noted Bryant's history with the juvenile court.

In addition to the statements made at the sentencing hearing, the trial court also had in its possession Bryant's forensic evaluation completed by Dr. Dreyer. That document encompassed several of the R.C. 2929.19(B)(1)(b) factors and went into detail about Bryant's mental and emotional health, how his maturity level compared to his peers, his history, and Dr. Dreyer's opinion about his amenability.

Based on the statements made at the sentencing hearing and other evidence in the record, we cannot say that the record affirmatively demonstrates that the court failed to consider the R.C. 2929.19(B)(1)(b) factors. Bryant's third assignment of error is overruled.

*Bryant*, 2024-Ohio-1192, at ¶ 38-40.

{¶ 25} Youngblood argues that the record in this case lacks sufficient information regarding the R.C. 2929.19(B)(1)(b) factors and, therefore, is distinguishable from *Bryant*, even though it similarly includes the PSI, a psychological evaluation related to Youngblood's amenability, and a guardian ad litem report regarding amenability. We disagree.

{¶ 26} The trial court stated at sentencing that it had reviewed the PSI, and the court's brief conversation with Youngblood confirmed that it had. Before imposing sentence, the

court questioned Youngblood about some of the statements he had made to the PSI investigator about how the offense occurred.   Specifically, it asked Youngblood why he had pled guilty when he had told the PSI investigator that he had not "tak[en] a shot" and that his friend had his gun when the shooting occurred.

{¶ 27} Despite Youngblood's argument on appeal, the record contained extensive information relevant to the factors in R.C. 2929.19(B)(1)(b).   The PSI reflected that Youngblood had turned 18 years old approximately a month before sentencing and was approximately 17½ years old when the offenses occurred.   Youngblood provided his version of February 9, 2024 shooting to the PSI investigator, which minimized his involvement.   He also told the investigator that he "did wrong and . . . messed up but every body make mistakes."   He discussed being a new father, needing to "man up and own up to what I did," and his plans to be there for his child.   He expressed that being incarcerated made him "mad and upset," but said "this is good for me so I can finish my class[,] get me a good paying job[,] making sure my baby girl good[.]"

{¶ 28} The PSI included reports on several aspects of Youngblood's life.   The social history detailed Youngblood's family and his upbringing.   He denied witnessing or suffering abuse and being around drugs, but he acknowledged that his parents and other family members had criminal records.   His father was never involved in his life.   Youngblood had recently become a first-time father with his long-time girlfriend.   The PSI also provided his educational history, indicating where he had received formal education and his lack of disciplinary history; Youngblood was in 12th grade when the incidents occurred.   The PSI indicated no military service or financial obligations.   It further addressed his history of substance use, which consisted of alcohol and marijuana, and his physical and mental conditions.

{¶ 29} The PSI contained extensive information about the February 9, 2024 offense and Youngblood's involvement, as well as Youngblood's juvenile criminal history. The record also included the transcript and exhibits from the April 11, 2024 probable cause hearing. Among the exhibits was a video-recording of Youngblood's interview with a detective on February 20, 2024.

{¶ 30} Youngblood's mother wrote a letter to the trial court on her son's behalf, stating that Youngblood had always been a "really good person, respectful, considerate, reliable kid." She indicated that things had changed in the past year after he began hanging out with a new crowd. She did not know whether to attribute his change to drugs or his desire for "street cred," but she noted that he had been influenced by these new friends and that he behaved differently when he was home or at school rather than with them.

{¶ 31} Finally, the PSI included the psychological evaluation of Youngblood by Dr. Daniel Hrinko and the guardian ad litem's recommendation as to amenability. Dr. Hrinko's nine-page report relayed Youngblood's self-reported histories of his childhood, education, mental and physical health, personal relationships, substance use, and interactions with the legal system. Among other things, Youngblood had described changing peer groups and explained why he carried a gun. Dr. Hrinko noted that Youngblood "appear[ed] to be exercising poor judgment focusing on his immediate circumstances without consideration or regard for long-term outcomes or consequences. It appears he has made some questionable choices regarding his social activities in the past year or two which have contributed to his involvement with the courts." Dr. Hrinko continued: "He has very little insight into the nature of his current situation, appearing to be unconcerned about the potential outcomes. . . . He indicated his expected outcome was to be able to 'finish school and get a job.' " Dr. Hrinko had also received additional information from Youngblood's

schools, mother, and probation officer, which were detailed. Ultimately, Dr. Hrinko concluded that Youngblood could respond to rehabilitation within the juvenile justice system and that the safety of the community could be adequately protected by placing Youngblood in a locked, secure facility.

{¶ 32} The guardian ad litem reached a different conclusion, expressing her belief that Youngblood would continue to reoffend and that any rehabilitation would likely take several years beyond his 21st birthday. She noted Youngblood's apparent goal "to live a criminal life on the streets" and that he had "gravitated toward influencers that glamorize street life and criminal activities and it appears he has done the same." The guardian ad litem indicated that Youngblood did not appear to express remorse or acknowledge the gravity of his actions.

{¶ 33} As in *Bryant*, the trial court had substantial available information with which to consider the youth-mitigation factors in R.C. 2929.19(B)(1)(b). On this record, we cannot say that the record affirmatively demonstrates that the court failed to consider the R.C. 2929.19(B)(1)(b) factors at sentencing. Accordingly, Youngblood's assignment of error is overruled.

### III. Conclusion

{¶ 34} The trial court's judgment is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HANSEMAN, J., concur.